PLANNED PARENTHOOD ASSOCIATION OF CINCINNATI, INC.; Norman E. Matthews, M.D., Plaintiffs-Appellees,

v.

The CITY OF CINCINNATI & Stanley Broadnax, M.D., Defendants-Appellants.

No. 86–3268.

United States Court of Appeals, Sixth Circuit.

Argued April 13, 1987.

Decided July 1, 1987.

Richard A. Castellini, John P. Concannon, Cincinnati, Ohio, Timothy M. Ruttle, argued, for defendants-appellants.

Alphonse A. Gerhardstein and Robert F. Laufman, Cincinnati, Ohio, for plaintiffs-appellees.

Before MERRITT and NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

The defendants, the City of Cincinnati and its Health Commissioner, Dr. Stanley Broadnax (hereinafter collectively referred to as Cincinnati or the City), appeal from the district court's order granting the plaintiffs a preliminary injunction against enforcement of Cincinnati's fetal disposal ordinance. The defendants attack the standing of the plaintiffs, as well as the merits of the lower court's decision. For the reasons which follow, we affirm.

**I.**

On January 8, 1986, the City Council of Cincinnati adopted Ordinance No. 8–1986, which regulates the disposal of aborted fetal remains. The Ordinance modified the provisions of Title 7 of the Cincinnati Municipal Code by ordaining Chapter 749. Section 749–1 states:

Disposal of Aborted Fetuses.

*Every hospital and clinic in which abortions are performed* or occur spontaneously, and every laboratory to which the aborted human fetuses are delivered, *shall provide that the fetuses be interred, deposited in a vault or tomb, cremated, or otherwise disposed of in a manner approved by the Commissioner of Health.* The hospital, clinic, or laboratory may complete any tests necessary for the health of the woman who conceived or carried such aborted fetus or her future offspring prior to disposing of the aborted fetus.

*No hospital or clinic where abortions are performed or spontaneously occur or laboratory which disposes of aborted fetuses shall dispose of any aborted fetuses without first receiving a permit to dispose of aborted fetuses from the Commissioner of Health.* The Commissioner of Health shall not issue a permit unless he determines that the applicant has appropriate facilities, methods, and capabilities for disposal of aborted human fetuses in a sanitary manner consistent with public health and safety. Each such hospital, clinic and laboratory shall report on a form provided by the Commissioner of Health the total number of aborted fetuses disposed of and a summary stating every manner of disposal used and the corresponding number of aborted fetuses for each manner of disposal. Such report shall be made annually by January 31 for the prior calendar year. A report must also be made whenever the methods of disposal used change. The Commissioner of Health shall provide forms for reporting under this section.

(Emphasis added). Section 749–3 defines an "aborted human fetus" as "the aborted offspring of human parents at every stage of biological development up to twenty weeks gestation which is not the subject of disposal and reporting requirements of the state of Ohio." Section 749–99 establishes the penalty for violating § 749–1 as a fine of not more than $1,000.

The City Council member who sponsored the Ordinance had issued a written statement concerning the Ordinance in the summer of 1985. That statement read in pertinent part:

An abortion produces human remains. An aborted fetus must be treated with the same dignity and legalities as a stillborn child or other dead person.... [I]t is my hope that this council will acknowledge that the abortion procedure takes a human life and that the human remains which are the by-products of this act are entitled to the dignity and respect afforded any other human being who has lost his or her life.

Among other comments concerning the Ordinance is a report issued by Health Commissioner Broadnax on September 10, 1985. Dr. Broadnax stated in the report his belief that the Ordinance added "nothing to safety or public health."

The Ordinance was to become effective on February 7, 1986, but on that day the plaintiffs, Planned Parenthood Association of Cincinnati, Inc. and its Medical Director, Dr. Norman E. Matthews, filed the instant complaint pursuant to 42 U.S.C. § 1983 and moved for a temporary restraining order enjoining Cincinnati from enforcing the Ordinance.[1] The district court granted the requested TRO the same day, enjoining the defendants from enforcing the Ordinance until February 17, 1986.

On February 17, 1986, the district court held a hearing on the plaintiffs' motion for

---

**1.** Along with their TRO motion, the plaintiffs filed several affidavits. One was from the Executive Director of the Cincinnati Planned Parenthood Association, who opined that requiring cremation, burial or interment of fetal remains would increase the cost of abortions. Another affidavit was from a local family planning counselor, who believed that the Ordinance would have a significant impact on a woman's decision whether or not to have an abortion because the Ordinance would increase the costs of an abortion and because it represented a statement by the City that a fetus is a human being deserving the respect of a burial. The City of Cincinnati moved to strike those affidavits as being irrelevant, hearsay and mere personal opinion. Although the district court eventually denied that motion, it expressly stated that it would not rely on the affidavits.

a preliminary injunction. As of that date, no regulation had been adopted by the City defining in more particularity the phrase "otherwise disposed of in a manner approved by the Commissioner of Health." The City had, however, drafted and submitted to the court a form by which an applicant could seek a permit to dispose fetal remains pursuant to the Ordinance. The permit application form requested the applicant to designate the method or methods of disposal to be used. The form also stated that for the purposes of the application, "disposal does not include transfer of aborted human fetuses to laboratories." At the district court hearing, the City confirmed that it did not contemplate adopting anything more than the permit; the permit was to constitute the entire regulation process. The City also did not contemplate that it would provide for an appeal from a decision denying a proposed disposal method. At the close of the hearing, the court extended the TRO until February 24, 1986.

On February 21, 1986, the district court filed its decision granting the plaintiffs' motion for a preliminary injunction. *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 635 F.Supp. 469 (S.D.Oh.1986). The court acknowledged that Cincinnati had the right under Ohio law to legislate regulations concerning sanitation, but it also observed that any ordinance dealing with abortion had to be consistent with the principles enunciated by the Supreme Court in cases such as *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983). 635 F.Supp. at 470–71. The court noted that in the *Akron* case the ordinance at issue, which required disposal of fetal remains "in a humane and sanitary manner," was struck down as being "void for vagueness." *Id.* at 471. In light of that holding, the district court found Cincinnati's statute to also be overly vague. The court objected to the portion of the statute allowing fetal remains to be "otherwise disposed of in a manner approved by the Commissioner of Health, or the State of Ohio;" the district court found that the

meaning of the phrase "otherwise disposed of" was not ascertainable "particularly in view of the intention of the City ... not to issue any regulations." *Id.*

The court also questioned the intent of the Ordinance. While the City claimed that the Ordinance was concerned solely with the sanitary disposal of fetal remains, the City was unable to produce any evidence either of a similar statute governing sanitary disposal of human tissue or any evidence that fetal tissue represents a greater health hazard. From this, the district court drew the conclusion that the apparent purpose of the Ordinance was to impermissibly interfere with or discourage abortions. *Id.*

Finally, the court observed that the Ordinance ran afoul of the statements in *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), that persons affected by a statute should not bear the burden of defending against prosecutions aimed at developing the structure and meaning of a statute in a piecemeal fashion. *Id.* at 472.

In concluding its analysis, the district court found that the plaintiffs had established the four factors which this court has stated should be considered in determining whether a preliminary injunction should issue. The district court therefore enjoined the defendants from enforcing the Ordinance until a hearing on the merits could be held. *Id.* at 472.

The defendants then brought this timely appeal from the injunction order.

## II.

Since the decision whether or not to grant a preliminary injunction is a function of a trial court's discretion, our review of a district court's order granting a preliminary injunction is generally limited to an examination of whether the district court abused its discretion. *Tate v. Frey*, 735 F.2d 986, 990 (6th Cir.1984). However, before we can reach the question of abuse of discretion in the instant case, we must first address whether the plaintiffs have standing to bring their action. The City con-

tends that they do not, taking the position that the language of the permit application form indicates that the activities of Planned Parenthood and its Medical Director will not give rise to prosecution under the Ordinance. Thus, according to the City, the plaintiffs have not shown any actual injury which has or will occur.

## A. Standing

■ The issue of standing, and whether a federal court has the power to adjudicate a suit, is "the threshold question in every federal case." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Examination of the standing issue involves two levels of inquiry. The first is of a constitutional dimension and involves determining whether the plaintiff has shown that a "case or controversy" exists between the parties as defined by Article III. *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976); *Warth,* 422 U.S. at 498, 95 S.Ct. at 2205. This can be accomplished by proving an actual injury or injury in fact which is "likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). The second inquiry involves considering whether, as a prudential matter, the plaintiff is the proper proponent of the rights on which the action is based. *Singleton,* 428 U.S. at 112, 96 S.Ct. at 2873.

■ One of the standards relevant to this second question is the well-established principle that a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205. There are exceptions to this rule, however, under which litigants have been permitted to assert the rights of third parties. There are essentially two types of cases involving *jus tertii* standing. The first is where the litigants challenge statutes which regulate their activity and, as a result, violate the rights of third parties. Plaintiffs in this type of case have uniformly been permitted to assert the rights of the affected third parties. *See Craig v. Boren,* 429 U.S. 190, 194–97, 97 S.Ct. 451, 455–57, 50 L.Ed.2d 397 (1976); *Eisenstadt v. Baird,* 405 U.S. 438, 443–46, 92 S.Ct. 1029, 1033–35, 31 L.Ed.2d 349 (1972). The second genre of *jus tertii* cases involve litigants seeking to assert solely the rights of third parties as being impinged by a statute. *Jus tertii* standing in this type of case is more difficult to establish, and generally depends on two factual elements. The first is whether the litigant's relationship with the third party whose right he seeks to assert is such that "the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue." *Singleton,* 428 U.S. at 114, 96 S.Ct. at 2874. The second is whether the third party is not as able to assert the allegedly affected right on his own behalf. *Id.* at 115–16, 96 S.Ct. at 2874–75.

■ With these principles in mind, we turn to the first level of constitutional inquiry, whether there is an injury in fact likely to be redressed by a favorable decision. Planned Parenthood asserts three separate injuries: (1) that it faces increased expenses under the Ordinance; (2) that it faces prosecution under the Ordinance; and (3) that the Ordinance will interfere with the clinic physician's practice and relationship with his patients. There is insufficient evidence in the record to support the allegation of increased expense. Although Planned Parenthood filed an affidavit by its Executive Director, in which the Director stated her belief that costs would increase, it appears there was essentially no foundation presented for this opinion, and the district court chose not to rely on it.

The second alleged injury of future prosecution is the primary focus of dispute. The statutory language of the Ordinance clearly contemplates that facilities such as the one operated by Planned Parenthood would be subject to application of the statute. The Ordinance itself states that "[e]very ... clinic in which abortions are performed *and* every laboratory to which aborted fetuses are delivered, *shall provide* that the fetuses be interred, deposited

in a vault or tomb, cremated or otherwise disposed of in [an approved] manner...." (Emphasis added). Consequently, it initially appears that Planned Parenthood is under a threat of potential prosecution and therefore has shown sufficient injury to establish the "case or controversy" requirement.

The City contends, however, that any viable threat of prosecution under the Ordinance is removed by the language contained in the disposal permit application form. As observed above, the Ordinance requires that fetal remains "be interred, deposited in a vault or tomb, cremated *or otherwise disposed of in a manner approved by the Commissioner of Health.*" (Emphasis added). The Ordinance also prohibits any "hospital or clinic where abortions are performed or spontaneously occur or laboratory which disposes of aborted fetuses," from disposing "any aborted fetuses without first receiving a permit to dispose of aborted fetuses from the Commissioner of Health." Responding to this requirement, the Cincinnati Health Department has issued the permit application form which requires the applicant to list the method or methods of disposal utilized. A footnote on the form also explains that for the purposes of the application, "disposal does not include transfer of aborted human fetuses to laboratories." It is this phrase which the City contends removes Planned Parenthood from coverage under the Ordinance, since Planned Parenthood merely transfers fetal remains to laboratories and consequently does not "dispose" of the remains as that term is defined in the permit application form. Because Planned Parenthood's activity is specifically excluded from coverage by the permit application form, the City argues that there is no real or credible threat of prosecution under the Ordinance. Accordingly, the City concludes that there is insufficient injury to provide Planned Parenthood with standing since Planned Parenthood is merely speculating that it may be subjected to prosecution, and such imaginary or speculative

fear is not sufficient under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), to provide a federal court with equitable jurisdiction.

We disagree with the City's analysis. The permit application form, and its exclusionary provision, was drafted only after Planned Parenthood initiated the instant suit, and it did not alter the actual terms of the Ordinance. Thus, the express statutory language of the Ordinance, which clearly renders the Ordinance applicable to a clinic such as that operated by Planned Parenthood, still could provide a basis for prosecution of Planned Parenthood. Since there is no requirement under the Ordinance that the City retain the current version of the permit application form, Planned Parenthood's fear of prosecution is reasonably founded in fact.

As to the speculativeness of prosecution, there is no requirement that a plaintiff necessarily subject himself to actual prosecution under a penal statute before bringing a federal action challenging that statute. In *Younger,* the Supreme Court held that three plaintiffs were not proper parties to a lawsuit attacking the constitutionality of a state statute and seeking to enjoin the prosecution of another plaintiff under that statute. The court observed that the three plaintiffs had not been indicted, arrested, or threatened with prosecution under the statute, nor had they alleged that prosecution was likely or even remotely possible. Under those circumstances, the Court found them to be improper plaintiffs, stating the principle that "persons having no fears of state prosecution except those that are imaginary or speculative, are not ... appropriate plaintiffs." 401 U.S. at 42, 91 S.Ct. at 749.[2] The Court also noted, however, that had the plaintiffs alleged that they would be prosecuted for contemplated conduct, and had the district court found the allegation to be true, "a genuine controversy might be said to exist." *Id.*

---

**2.** This holding and analysis was completely unrelated to the Court's separate discussion of the federal abstention doctrine, premised on notions of comity and federalism. 401 U.S. at 43–54, 91 S.Ct. at 750–51.

The Court subsequently clarified these pronouncements in *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). There, the Court held that when prosecution seems apparent, a litigant need not first expose himself to actual arrest or prosecution to be entitled to challenge a statute. *Id.* at 459, 94 S.Ct. at 1215. More recently, the Court stated that when a plaintiff "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (quoting *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973)). Planned Parenthood has alleged its intention to engage in conduct arguably affected with a constitutional interest, and we believe the statutory language of the Ordinance evinces a credible threat of prosecution against Planned Parenthood. Accordingly, we find that Planned Parenthood meets the "injury in fact" requirement of standing.

Turning to the second level of inquiry on the standing issue, we find as a prudential matter that Planned Parenthood and its Medical Director are proper proponents of the rights asserted in this case. First, insofar as they are attacking the Ordinance on vagueness grounds, they are asserting their own rights. The argument is that the Ordinance violates due process because of the unclear language allowing disposal as "otherwise approved" by the City Health Commissioner. Planned Parenthood and its Medical Director are clearly the proper proponents to assert these rights. Second,

they are the proper proponents of the third party rights they are asserting, since those rights are "inextricably bound up" with the activity the Planned Parenthood clinic desires to pursue and seemingly would not be asserted as effectively by the third parties who actually possess those rights. It is asserted that the Ordinance interferes with a woman's decision to have an abortion. Not only is that decision tied closely to the activity of the Planned Parenthood clinic, but women seeking to assert that right for themselves are faced with several obstacles as recognized in *Singleton,* 428 U.S. at 117, 96 S.Ct. at 2875.[3] Accordingly, we find that Planned Parenthood and its Medical Director are proper proponents of the third party rights, as well as of their own rights. Since both prongs of the standing inquiry are met, we conclude that Planned Parenthood and its Medical Director have standing to pursue this equitable action.[4]

B. Injunctive Relief

This conclusion leaves us to the task of determining whether the district court properly exercised its discretion in granting the preliminary injunction. *See Tate,* 735 F.2d at 990. This inquiry entails a consideration of the familiar four factors which we have found to indicate whether a preliminary injunction should issue. They are:

1. Whether the movant has shown a strong or substantial likelihood or probability of success on the merits.

2. Whether the movant has shown irreparable injury.

3. Whether the preliminary injunction could harm third parties.

4. Whether the public interest would be served by issuing the preliminary injunction.

*Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1263 (6th Cir.1985). Fur-

---

**3.** "As to the woman's assertion of her own rights, there are several obstacles. For one thing, she may be chilled from such assertion by a desire to protect the very privacy of her decision from the publicity of a court suit. A second obstacle is the imminent mootness, at least in the technical sense, of any individual woman's claim. Only a few months, at the most, after the maturing of the decision to undergo an abortion, her right thereto will have been irre-

vocably lost...." 428 U.S. at 117, 96 S.Ct. at 2875.

**4.** This is consistent with the Supreme Court's practice in past abortion cases. *Cf. Margaret S. v. Edwards,* 794 F.2d 994, 997 (5th Cir.1986) ("the Supreme Court has visibly relaxed its traditional standing principles in deciding abortion cases").

thermore, because the grant of the preliminary injunction "was in no sense a final disposition," we will refrain from engaging in a comprehensive review of the merits beyond what is minimally necessary "to determine if the trial court exceeded reasonable discretion in rendering preliminary relief." *Tate*, 735 F.2d at 990.

The first consideration, and the one on which the parties have primarily focused, is whether the plaintiffs have shown a substantial likelihood or probability of success on the merits of any of their claims. The City argues that there is not a likelihood that Planned Parenthood can successfully establish that the Ordinance is unconstitutional. The City defends the propriety of the Ordinance primarily on the ground that it represents a legitimate exercise of the City's power to regulate the sanitary disposal of fetuses.

It is undisputed that a woman's decision to have an abortion is a fundamental right protected by the Constitution. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). However, courts have also accepted the principle that a state may, as a valid exercise of its police power, promulgate legislation regulating the disposition of aborted fetal remains to protect public health and safety. *See, e.g., City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 452 n. 45, 103 S.Ct. 2481, 2504 n. 45, 76 L.Ed.2d 687 (1983) (city is free "to enact more carefully drawn regulations that further its legitimate interest in proper disposal of fetal remains"); *Leigh v. Oison*, 497 F.Supp. 1340, 1351 (D.N.D.1980); *Planned Parenthood Ass'n v. Fitzpatrick*, 401 F.Supp. 554, 573 (E.D. Pa.1975), *aff'd mem. sub nom. Franklin v. Fitzpatrick*, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976). Thus, Cincinnati has a legitimate interest in regulating disposal of fetal remains. The essential question, however, is · whether Cincinnati exceeded the legitimate exercise of its power to regulate that interest when it enacted the Ordinance. Planned Parenthood urges that the Ordinance is impermissible because it is unconstitutionally vague and interferes with a woman's decision to have an abortion.

While no case is directly on point, there exists a group of analogous cases which provide a helpful background for analyzing the instant Ordinance. The first pertinent decision is *Planned Parenthood Ass'n v. Fitzpatrick, supra*. In that case, Pennsylvania adopted an enabling statute requiring the state Department of Health to "make regulations to provide for the humane disposition of dead fetuses." 401 F.Supp. at 572. The statute was challenged on the ground that future regulations would "require elaborate funeral provisions, treating the fetus as a human, and that psychologically and financially such regulations [would] burden a pregnant woman's decision concerning abortion." *Id.* The state submitted that the purpose of the statute was merely "to preclude the mindless dumping of aborted fetuses on to garbage piles." *Id.* at 573. The district court upheld the constitutionality of the enabling statute, stating:

> We believe that the state in the constitutional exercise of its police power may provide for the disposition of dead fetuses to protect the public health. The language of the statute which troubles plaintiffs is that it requires the *humane* disposition of dead fetuses. ˙ Of course, a regulation that requires expensive burial may very well invade the privacy of the pregnant woman and burden her decision concerning an abortion. However, no such regulation has been adopted to date pursuant to section 5(c), and we find that this section is not unconstitutional on its face.

*Id.* (emphasis in original). The Supreme Court affirmed without opinion. *Franklin v. Fitzpatrick*, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976).

Some further guidance is found in the *Akron Abortion* decisions. *See Akron Center for Reproductive Health, Inc. v. City of Akron*, 479 F.Supp. 1172 (N.D.Ohio 1979), *aff'd in relevant part and rev'd in part*, 651 F.2d 1198 (6th Cir.1981), *aff'd in relevant part and rev'd in part*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983). The district court in that case struck down as unconstitutionally vague the portion of

an Akron ordinance which required a physician who performed an abortion to "insure that the remains of the unborn child [be] disposed of in a humane and sanitary manner." 479 F.Supp. at 1206. The district court opinion stated:

The present section could, depending upon the sensitivities of the listener, be interpreted as meaning any number of things including the imposition of the "expensive burial" feared by plaintiffs in ... *Fitzpatrick*.... The appropriate method for Akron's city council to have followed to insure that aborted fetuses are disposed of in a manner that they considered "humane," would have been to specifically state what methods of disposal were not or, alternatively, were acceptable. Accordingly, the Court finds [the ordinance] void for vagueness.

*Id.* (citation omitted).

The Supreme Court eventually affirmed the holding that the disposal statute was unconstitutionally vague in violation of the Due Process Clause, rejecting the City's argument, drawn from *Fitzpatrick*, that the purpose of the statute was simply to preclude mindless dumping of aborted fetuses. The Court first observed that due to the word "humane" the intent of the statute was far from clear and seemed to indicate an intent to mandate some sort of decent burial. The Court also distinguished *Fitzpatrick* because that statute did not itself impose criminal sanctions, but merely provided for the promulgation of further regulations. The Court's basis for striking down the Akron statute was that the meaning of the phrase "humane and sanitary" was uncertain and therefore failed to give proper notice to a physician that his contemplated conduct would be forbidden. In a closing comment, the Court acknowledged, as the district court had also acknowledged, that Akron was free to "enact more carefully drawn regulations that further its legitimate interest in proper disposal of fetal remains." 462 U.S. at 452 n. 45, 103 S.Ct. at 2505 n. 45.

Another relevant case is *Leigh v. Olson*, 497 F.Supp. 1340 (D.N.D.1980). There, a North Dakota statute provided that an aborted fetus had to be disposed of "in a humane fashion in compliance with regulations promulgated by the state department of health." 497 F.Supp. at 1351. A regulation was promulgated which required the physician performing an abortion "to inform the patient ... as to the options open for the disposal of the fetus" and to obtain the patient's signature on a form detailing those options. *Id.* The district court upheld the facial constitutionality of the enabling statute, but found it unconstitutional as applied due to the enacted regulation. The court found that the regulation interfered with a woman's decision to have an abortion by placing the burden of deciding the manner of disposal on the woman and making this decision a prerequisite to obtaining an abortion. *Id.* *Leigh* therefore stands for the principle that a disposal statute must not interfere, burden or inhibit the abortion decision.

We finally acknowledge a series of decisions entitled *Margaret S.*, in which plaintiffs challenged various statutes passed by Louisiana for the purpose of regulating abortions. *See Margaret S. v. Edwards*, 488 F.Supp. 181 (E.D.La.1980) (*Margaret S. I*); *Margaret S. v. Treen*, 597 F.Supp. 636 (E.D.La.1984) (*Margaret S. II*), *aff'd sub nom. Margaret S. v. Edwards*, 794 F.2d 994 (5th Cir.1986). In *Margaret S. II*, the district court struck down a provision requiring the attending physician to inform the woman, within twenty-four hours after an abortion, that she could choose to have the fetus cremated, buried, or disposed of as waste tissue. The district court held that the law "suggests to the woman that [the state] equates abortion with the taking of a human life ... [and] thus penalizes those women who do exercise their constitutional right in choosing abortion." 597 F.Supp. at 670 (citations omitted). The Fifth Circuit neither approved nor disapproved of this rationale but instead found the provision unconstitutional on the ground that it improperly required the physician to *personally* disclose the information about disposal. 794 F.2d at 998. Thus, the significance of *Margaret S. II* is only that a state cannot require a physician to personally tell a woman about the op-

tions of disposal, even if the woman is not so informed until after the abortion is performed.

■ We examine the Cincinnati Ordinance mindful of the principles set forth in these cases. The district court below concluded that the Ordinance was likely to be found unconstitutional on the ground of vagueness, drawing its reasoning from the *Akron Abortion* decisions. We agree that there is a substantial probability that Planned Parenthood can show that the portion of the Ordinance permitting fetal remains to be "disposed of in a manner [otherwise] approved by the Commissioner of Health," is unconstitutionally vague. The Supreme Court has held that the contours of a vague criminal statute cannot be developed through piecemeal prosecutions. *Dombrowski v. Pfister*, 380 U.S. 479, 490–91, 85 S.Ct. 1116, 1122–23, 14 L.Ed.2d 22 (1965); *Baggett v. Bullitt*, 377 U.S. 360, 378, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). The parameters of prohibited or permitted activity must be ascertainable from the statute or regulations implementing the statute. That is, there must be some objective guidance. The portion of the instant Ordinance permitting disposal in manners otherwise approved by the Health Commissioner is purely subjective and open to ad hoc changes in policy. Consequently, it fails to provide sufficient warning to parties as to what methods will or will not be disapproved and therefore be subject to prosecution. Thus, it appears substantially

likely that the Ordinance violates the Due Process Clause for failure to give "fair notice that ... contemplated conduct is forbidden." *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). *See Akron Center for Reproductive Health*, 462 U.S. at 451–52, 103 S.Ct. at 2503–04.

The City argues that the other portions of the Ordinance, which explicitly set forth specific authorized methods for disposal such as cremation or interment, are sufficient to save the Ordinance from attack on grounds of vagueness. Those portions are indeed not vague and are the likely result of the statements in the *Akron Abortion* decisions that Akron should have specifically stated what methods of disposal would or would not be acceptable. 462 U.S. at 452 n. 45, 103 S.Ct. at 2504 n. 45; 479 F.Supp. at 1206. However, the fact remains that a portion of the instant Ordinance is vague, and we decline to sever that portion of the Ordinance from the rest in order to consider the constitutionality of the remainder of the Ordinance.

Because we find a substantial likelihood of success on the vagueness argument, we decline to reach the second ground asserted by Planned Parenthood for finding the Ordinance unconstitutional—that it impermissibly interferes with a woman's decision to have an abortion. This does not, of course, preclude the district court from considering this argument in reaching a final determination on the merits.[5] We simply find it

---

**5.** Planned Parenthood asserted before this court two grounds for finding that the Ordinance interferes with a woman's constitutional right to have an abortion. It first argued that the Ordinance burdens effective enjoyment of that right because it conveys the message that a fetus is a human being deserving the respect and dignity of a formal burial. Planned Parenthood contends that this official statement by the City will confuse women and deter them from exercising their right to have an abortion, by undermining their belief that the decision to have an abortion is a constitutionally protected, fundamental right. While we do not resolve the merits of this contention, we do note that the decision concerning abortion cannot be impermissibly burdened and that courts have generally cautioned against requiring aborted fetuses to be treated with the dignity of a human life. We also note, however, that the instant Ordinance is

distinguishable from those which were found to interfere with the abortion decision in *Leigh v. Olson*, 497 F.Supp. 1340 (D.N.D.1980), and *Margaret S. v. Treen*, 597 F.Supp. 636 (E.D.La.1984), aff'd sub nom. *Margaret S. v. Edwards*, 794 F.2d 994 (5th Cir.1986).

Planned Parenthood's second ground for its interference argument is that the Ordinance will burden the abortion decision by increasing the cost of an abortion. Again, we render no decision as to this argument, but merely note that it has been acknowledged that requiring expensive burial of fetal remains may impermissibly interfere with the decision to have an abortion by financially burdening that decision. *Planned Parenthood Ass'n v. Fitzpatrick*, 401 F.Supp. 554, 573 (E.D.Pa.1975), aff'd mem. sub nom. *Franklin v. Fitzpatrick*, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976).

unnecessary to address the issue at this juncture.

Having been convinced of the presence of the first factor to be considered in granting a preliminary injunction—substantial likelihood of success on the merits—we also approve the district court's conclusion that the remaining three factors militate in favor of granting the injunction. The City controverts the second factor, arguing that Planned Parenthood has not shown any irreparable injury. We agree with the district court, however, that there is potential irreparable injury in the form of a violation of constitutional rights. The City also contends under the third factor that issuance of the injunction will cause substantial harm by preventing the City from enforcing its Ordinance. We disagree. As we have already stated, there is a likelihood that the Ordinance will be found unconstitutional; it is therefore questionable whether the City has any "valid" interest in enforcing the Ordinance. Consequently, we find no substantial harm in preventing the City from enforcing it. Finally, the last factor—whether the public interest is served by the injunction—is also met, since the public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional.

In sum, our review of the facts of this case under the four preliminary injunction factors convinces us that the district court did not abuse its discretion in granting the injunction.

Accordingly, the judgment of the district court is AFFIRMED.

MERRITT, Circuit Judge, concurring.

The issue in this case concerns the constitutionality of a city ordinance requiring that fetal remains from first trimester abortions either be (a) "interred, deposited in a vault or tomb, [or] cremated" or (b) "otherwise disposed of in a manner approved by the Commissioner of Health." I agree with Judge Contie that the portion of the ordinance—"or otherwise disposed of in a manner approved by the Commissioner" —would be unconstitutionally vague standing on its own. Therefore, to uphold the ordinance, we must examine the specific fetal disposal methods prescribed by the other portion of the ordinance.

In *Mahoning Women's Center v. Hunter*, 610 F.2d 456, 460 (6th Cir.1979), this Court held invalid a city ordinance on the grounds that it undermined "the effective enjoyment of that [abortion] right by imposing heavy and unnecessary conditions." The Cincinnati ordinance's requirement that first trimester fetal remains be "interred, deposited in a vault or tomb, [or] cremated" unnecessarily burdens and adds to the cost of a woman's right to an abortion during the first trimester. Therefore, under the reasoning of *Mahoning*, the specific means of disposal prescribed by the ordinance constitute an impermissible burden on a woman's effective enjoyment of her constitutional right to an abortion. Accordingly, the vagueness of the ordinance is not cured by its more specific language.

Like the dissent, I value free speech as well as open and robust discussion of issues. Nonetheless, in my view, the dissent incorrectly frames the issue in this case as one concerning the First Amendment rights of the Cincinnati City Council to propound its views on abortion. This is not a case where a city councilman simply gives a speech regarding the abortion issue. We are required here to consider the end-product of the City Council's deliberations, *i.e.*, its ordinance, to determine whether it is constitutional. We know of no authority—and the dissent cites none— for the proposition that the ordinance itself is constitutionally protected speech. There is a significant distinction between speech and governmental regulation. Legislation regulating conduct, such as the ordinance at issue in this case, serves to limit the freedom of the individuals within the authority of the governmental entity. For the courts to defer to this sort of legislative action on free speech grounds would frustrate the judicial review which is necessary to protect constitutional rights generally.

Accordingly, I concur in the judgment of the Court.

DAVID A. NELSON, Circuit Judge, dissenting.

I agree that the plaintiffs have standing, in a sense, to bring this lawsuit, but I do not believe they have shown the requisite likelihood of winning it. Assuming there is nothing about the case that precludes application of the normal standards for evaluating "a pre-enforcement facial challenge to a [municipal] ordinance on the ground that it is unconstitutionally vague" (*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 491, 102 S.Ct. 1186, 1189, 25 L.Ed.2d 697 (1982)), the record, as I read it, does not establish a substantial probability that Cincinnati's rather narrowly drawn ordinance will ultimately be held void for vagueness.

Just as the plaintiffs failed to sustain their burden of proving a strong likelihood of ultimate success on the merits, in my view, so also did they fail to show that any "injury" threatened by the mere existence of the ordinance is "irreparable," or that the public interest would somehow be served by the issuance of a preliminary injunction before the Cincinnati Health Commissioner has determined whether aborted fetuses from the plaintiffs' clinic are being disposed of in a manner that is sanitary and safe. Unless *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), requires that the plaintiffs' application for a preliminary injunction be decided under rules far more lenient than those that govern the granting of preliminary injunctive relief under less controversial circumstances, it seems quite clear to me that the district court erred in granting the injunction.

The plaintiffs advanced several claims of unconstitutionality—including a claim that the ordinance violates the right to engage in interstate commerce—but the only one as to which the court finds a substantial likelihood of success is the claim that the ordinance is unconstitutional on its face because its "prohibitions are not clearly defined." *Cf. Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). In the words of the classic formulation of the "void for vagueness" principle, the terms of the ordinance are supposed to be "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application...." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Were it not for the fact that my colleagues have found the plaintiffs' void for vagueness argument persuasive, I must say that I should not have thought the argument deserving of any very extensive discussion.

Section 749–1 of the Cincinnati Municipal Code, as enacted by § 1 of the ordinance, starts out by saying that abortion clinics "shall provide that the fetuses be interred, deposited in a vault or tomb, [or] cremated." If it had stopped there, I take it that no one could seriously contend the ordinance was impermissibly vague.[1] The terms quoted do not become any less certain merely because the ordinance goes on to offer an additional option—allowing the fetuses to be "otherwise disposed of in a manner approved by the Commissioner of Health"—and I am at a loss to understand why inclusion of the additional option should make the ordinance void for vagueness if the ordinance would not be void for vagueness without it.

If an abortion clinic fails to provide that its fetuses be interred, entombed or incinerated, and fails to obtain the approval of the Commissioner of Health for disposal of the fetuses in some other manner, it takes no guesswork at all to know whether the clinic is violating the ordinance: it is. Obviously such a clinic might wish to utilize, or have its laboratory utilize, some sanitary method of disposal less costly than interment, entombment, or incineration, and obviously it is conceivable—if unlikely—that the clinic might find itself unable to resort to the

---

**1.** Judge Merritt seems to agree; his concurring opinion suggests that if the ordinance had stopped with the language quoted above, the ordinance would be void not for vagueness but for making abortions unnecessarily expensive.

(Whether enforcement of the ordinance as passed would add appreciably to the cost of abortions performed by the plaintiffs in this case is something we have no way of knowing.)

alternate method because of an arbitrary refusal by the Commissioner of Health to approve it. In that event, however, the fault would be in the Commissioner, not in the ordinance. In the absence of any showing that the plaintiffs have ever sought approval for an alternate method of disposal, I am certainly not prepared to assume that a proper application for approval would be denied other than "for sanitary reasons" or "to protect the public health and safety," those being the standards set forth in both the preamble and the first of the code sections enacted by the ordinance. (The ordinance does not require, of course, that a disposal method approved by the Commission be "humane;" that is not one of the standards prescribed here.)

The plaintiffs have not disclosed what method of disposal is being used now by the pathology laboratory to which their fetuses are delivered, but I find it hard to believe that the Planned Parenthood Association of Cincinnati—whose national parent organization, as we know from the motion papers, has a "medical protocol" establishing standards for all laboratories used by its affiliates—would permit fetuses to be disposed of other than in "a sanitary manner consistent with public health and safety," as contemplated by the ordinance. Surely Planned Parenthood would not suffer any human tissue to be disposed of in a manner that might contaminate water supplies, food supplies, or blood supplies. And if the fetuses are in fact being disposed of in a sanitary manner consistent with public health and safety, I do not see what legitimate objection there could be to asking the Health Commissioner to approve the method in question, whatever it may be. If by some chance the fetuses are not being disposed of in a sanitary manner, on the other hand, I know of no provision in the United States Constitution that could fairly be interpreted as prohibiting the city from requiring the plaintiffs to mend their ways.

It is true that the ordinance does not specifically name every method of disposal that the Commissioner of Health might be persuaded to approve, and perhaps, at bottom, the plaintiffs' "void for vagueness" argument is really an argument that the ordinance represents an impermissible delegation of legislative authority. If so, it seems obvious that the argument must fail. The ordinance is not without standards to guide the exercise of the Health Commissioner's discretion—the unnamed disposal methods must be "sanitary" and "consistent with public health and safety"—and even if we were dealing here with a federal statute, I do not see how we could strike it down as an unconstitutional delegation of authority without repudiating a large body of Supreme Court precedent[2] and, in the process, jeopardizing the statutory foundations of the whole modern welfare state.

The fact that the ordinance was adopted by the City Council of Cincinnati and not by the Congress of the United States makes the constitutionality of the ordinance even more readily apparent. According to the Court of Appeals for the Second Circuit, at least, "[t]he check on the authority of the executive branch of the federal government, flowing from the 'delegation' doctrine, derives from the separation of powers and is not enforceable against the states." *Friedman v. Beame*, 558 F.2d 1107, 1111 n. 8 (2d Cir.1977). The federal constitution provides that every state shall be guaranteed "a Republican Form of Government," U.S. Const., Art. IV, Sec. 4, but this guarantee, the Supreme Court has said, does not make it mandatory that state governments observe the separation of powers doctrine. *Sweezy v. New Hampshire*, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957).

As far as Ohio law is concerned, a legislative enactment that confers discretion on

**2.** See, *e.g., McKinley v. United States,* 249 U.S. 397, 39 S.Ct. 324, 63 L.Ed. 668 (1919); *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928); *Sunshine Anthracite Coal Co. v. Adkins* 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S.

591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Federal Communications Commission v. R.C.A. Communications, Inc.,* 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); *Atlas Roofing Co. v. Occupational Safety & Health Review Commission,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977).

an administrative officer "without establishing *any* standards for guidance" may be upheld when the discretion is to be exercised under "a police regulation for the protection of the public morals, health, safety or general welfare, and it is impossible or impracticable to provide such standards...." *Office of Consumers' Counsel v. Public Utilities Commission*, 58 Ohio St.2d 108, 388 N.E.2d 1370, 1374 (1979) (quoting the syllabus of *Matz v. J.L. Curtis Cartage Co.*, 132 Ohio St. 271, 7 N.E.2d 220 (1937)) (emphasis supplied). The ordinance here under consideration is, by its terms, an ordinance for the protection of the public health and safety, and even if it did not expressly permit disposal of aborted fetuses by interment, entombment or cremation, it would still contain acceptable standards for the guidance of the Health Commissioner, because it would still require him to grant or withhold approval of any proposed disposal method on the basis of its "sanitary" character and its consistency with "public health and safety." The notion that those standards are unconstitutionally vague makes no more sense to me than the notion that the plaintiffs cannot be expected to know whether they are in compliance with the ordinance when they allow their aborted fetuses to be disposed of in a manner that they know has not been approved by the Commissioner of Health and that does not consist of interment, entombment or incineration.

If for some reason the plaintiffs in the case at bar cannot tell whether the particular disposal method used by their laboratory, whatever that method happens to be, is a method explicitly approved by the ordinance, and if they cannot tell whether it is one of the methods that has otherwise been approved by the Commissioner of Health, a simple remedy is at hand; all they have to do is ask the Commissioner of Health.[3] If they know their disposal method has not yet been approved but they think it can be shown to be sanitary and free of hazard to the public health or safe-ty, similarly, all they have to do is ask for approval.

In view of "the highly visible political controversies revolving around the morality of abortion," see *Margaret S. v. Edwards*, 794 F.2d 994, 995 (5th Cir.1986), I can readily understand why, from the plaintiffs' standpoint, a published federal court decision holding Cincinnati's ordinance unconstitutional on its face might seem preferable to a letter from the Commissioner of Health approving the manner in which the plaintiffs' fetuses are disposed of. It is harder for me to understand, however, why such a judicial decision should seem preferable from the standpoint of the courts. We do not normally allow ourselves to be used thus by people who might reasonably be thought to have a greater interest in scoring political points than in securing redress of any actual grievance; suitors who claim to be threatened with injury but who hold in their own hands the means of repairing or preventing the threatened injury are not usually accorded equitable relief in the courts of the United States.

I hasten to add that in saying this I do not intend to cast any aspersions on the sincerity and good will of the plaintiffs or their counsel; it is our responsibility, not theirs, to decide whether injunctive relief is appropriate, and they obviously have every right to request such relief. Neither do I wish to take issue with the assertion that one of the motives—possibly the principal motive—for the city council's enactment of the ordinance was to make a political "statement," veiled and indirect though it may have been, about the issue of abortion itself. The possibility that the ordinance may have been intended to make that kind of political point, however, does not suggest to me that we ought to relax the usual standards for the granting of a preliminary injunction. On the contrary, I think a proper respect for the values embodied in the First Amendment counsels that those standards be applied at least as rigorously in a

---

3. See *Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 49, 86 S.Ct. 1254, 1263, 16 L.Ed.2d 336 (1966), where Justice Potter Stewart, speaking for the Supreme Court, noted that those who professed to find a statutory definition unclear had been given "access to [an administrative authority] for a ruling to clarify the issue."

case involving political expression as in any other case.

If, as the plaintiffs' briefs seem to suggest, this is really a political expression case, the basic question it presents is, to my mind, more interesting—if not more difficult of resolution—than the question of whether the Cincinnati ordinance is void for vagueness. That question is whether an ordinance enacted for the primary purpose of making a political statement on the issue of abortion would impermissibly interfere with the right every newly-pregnant woman has had since 1973—the right to obtain a first trimester abortion without having to risk going to jail for it.

It would be shutting our eyes to the obvious to ignore the fact that abortion is an issue on which many thoughtful people hold views that are as widely divergent as they are passionately held. The very Supreme Court decision that decriminalized first trimester abortions begins with an acknowledgment of the Court's "awareness of the sensitive and emotional nature of the abortion controversy, of the vigorous opposing views, even among physicians, and of the deep and seemingly absolute convictions that this subject inspires." *Roe v. Wade,* 410 U.S. 113, 116, 93 S.Ct. 705, 708, 35 L.Ed.2d 147 (1973). *Roe v. Wade* neither ended the controversy nor foreclosed discussion of the merits of the decision itself. And such discussion can be healthy, I believe; without widespread public discussion of *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), for example, who can say that the public would have come to believe as firmly as it has that the Supreme Court reached the right result in *Brown* and the wrong result in *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896)?

I do not know whether, fifty years hence, the public will view *Roe v. Wade* in the light in which it now sees *Brown* or the light in which it now sees *Plessy.* I do know, however, that public discussion of the issue of abortion is not to be stilled by any court. The plaintiffs argue that "there is simply no governmental interest supporting the [Cincinnati ordinance] other than the prohibited one of trying to declare the fetus to be a separate human being," but that dog will not hunt, in my opinion. Even if there were not an obvious public health interest in seeing that fetal remains are disposed of in a safe and sanitary manner, the City Council of Cincinnati would not be "prohibited" from endorsing the view that a human fetus is a separate human being, any more than the press could be prohibited from reporting, as it did, that a Cincinnati councilman had expressed the hope that in adopting the fetal disposal ordinance the "council will acknowledge that the abortion procedure takes a human life."

On its face, of course, the ordinance does not say what the councilman said he wanted the council to acknowledge, and neither does it require that its terms be brought to the attention of any woman who has had, or who might wish to obtain, an abortion. We are not called upon in this case to decide whether the Cincinnati City Council could require physicians who perform abortions to inform their clients of the options for disposing of the fetal remains (see *Margaret S. v. Treen,* 597 F.Supp. 636 (E.D.La. 1984), *aff'd sub nom. Margaret S. v. Edwards,* (5th Cir.1986), and *Leigh v. Olson,* 497 F.Supp. 1340 (D.N.D.1980)), for the Cincinnati ordinance requires no such thing. The clients are not required to exercise any choice with respect to the method by which their aborted fetuses are disposed of, they are not required to be told that they have a choice, and they are not required to be informed of anything else.

I would not suggest, of course, that none of plaintiffs' clients knew that Cincinnati had adopted an ordinance regulating the disposal of fetal remains by abortion clinics and laboratories. The plaintiffs have shown that "[t]here was a great deal of press surrounding the passage of the fetus disposal ordinance," and a pregnancy termination counselor at the plaintiffs' clinic says in her affidavit that she has had "numerous counseling sessions in which the ordinance was discussed." Many of the women counseled are said to have "expressed confusion and anger with respect to the ordinance," and the plaintiffs rely on

this testimony to support their contention that the city has somehow "interfered" with the rights secured by *Roe v. Wade* and its progeny. I do not doubt that such discussions have occurred, but unless we are to hold that *Roe v. Wade* repealed the First Amendment, I do not think they can make the ordinance unconstitutional.

If plaintiffs' clients have learned of the ordinance, through the press or otherwise, and if plaintiffs' clients have inferred that its enactment represents an oblique comment on a political issue as to which, as almost every literate American knows, public opinion is sharply divided, and if plaintiffs' clients feel "confusion and anger" as a result, it seems to me that their confusion and anger are an unavoidable consequence of their living in a pluralistic society where the right to criticize the current orthodoxies—whether constitutionalized or not—is explicitly protected by the same Constitution that has been held implicitly to prohibit state and local governments from making it a crime to procure a first trimester abortion. For the Cincinnati City Council to adopt a resolution expressing open disapproval of *Roe v. Wade* and petitioning for a return of the Constitution to the *status quo ante* 1973 would probably anger many of the plaintiff's clients even more than they were angered by adoption of the fetal disposal ordinance actually passed—but that would hardly make such a resolution unconstitutional.[4]

The First Amendment says that Congress shall make no law "abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The federal courts, as I understand it, sit to protect these hard-won rights, and not to accomplish by judicial fiat that which Congress is expressly prohibited from doing. The question presented in *Roe v. Wade* was whether the states could make it a crime to procure an abortion. In holding that under certain circumstances they could not, the Supreme Court recognized a right of privacy which, while it is "broad enough to encompass a woman's decision whether or not to terminate her pregnancy," is undeniably a right that "[t]he Constitution does not explicitly mention. . . ." *Roe*, 410 U.S. at 153 and 152, 93 S.Ct. at 726. What the outer limits of this unmentioned right may be I do not know; but where the right begins to conflict with rights that. *are* explicitly mentioned in the Constitution, surely the courts ought to be more solicitous of the latter than of the former. What the framers actually said must be given controlling weight in the event of a conflict with what we think they implied.

The point seems academic, however, because there is no such conflict here. The Cincinnati ordinance does not "interfere" in any meaningful sense with a woman's decision on whether or not to terminate her pregnancy by abortion. Insofar as the ordinance may serve as an indirect reminder that there is a school of thought that equates such termination of a pregnancy with termination of a life, the ordinance may conceivably make for slightly more thoughtful decisions on whether to terminate or not to terminate. That ought not to trouble us unduly, I think, even in the probably unlikely event that the mere existence of the ordinance might be enough to move someone to choose birth over abortion. I cannot believe that a woman's right to decide for herself whether or not to terminate her pregnancy by abortion means that a state may offer strong encouragement to choose abortion (*e.g.* by providing public funding for abortions), but may not do or say anything that might conceivably have any tendency to encourage the opposite choice.[5]

---

4. The concurring opinion suggests—and I certainly agree—that if the ordinance is void for vagueness, the First Amendment cannot save it. If the ordinance is not void for vagueness, however, the First Amendment suggests that we ought not accept the plaintiffs' invitation to hold it void for explicitness.

5. The district court evidently read *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), as teaching that the state may not adopt any legislation that has the slightest tendency to encourage any choice other than abortion. 635 F.Supp. at 471. It will come as no surprise that I do not read either *Danforth* or *City of Akron v.*

To recapitulate, I do not believe that the Cincinnati ordinance improperly burdens the exercise of any constitutional right, I do not believe that the ordinance is the least bit vague, I do not believe that it represents an unconstitutional delegation, I do not believe that the plaintiffs have shown any irreparable injury as a result of its enactment, I do not believe that the public interest was served by issuing a preliminary injunction before the Cincinnati Commissioner of Health was given an opportunity to say whether the method of fetal disposal used by the plaintiffs' laboratory is safe and sanitary, and I do not believe that the plaintiffs could sustain their burden of proving the preliminary injunction harmless when they made no attempt to prove that their method of fetal disposal is safe. I think, in short, that the district court abused its discretion in granting the injunction, and I would have reversed the order.

*Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), as teaching anything of the sort.