PLANNED PARENTHOOD OF AR- KANSAS AND EASTERN OKLA- HOMA, d/b/a Planned Parenthood of the Heartland–Oklahoma, Plaintiff,

v.

Terry L. CLINE, in his official capacity as Oklahoma Commissioner of Health, Defendant.

Case No. CIV–12–1245–F.

United States District Court, W.D. Oklahoma.

Dec. 24, 2012.

---

Anne E. Zachritz, Leif E. Swedlow, Andrews Davis PC, Oklahoma City, OK, Carrie Y. Flaxman, Planned Parenthood Federation of America Inc., Washington, DC, Meg D. Holzer, Roger K. Evans, Planned Parenthood Federation of America, New York, NY, for Plaintiff.

Charles S. Rogers, Dixie L. Coffey, Kindanne C. Jones, Attorney General's Office, Oklahoma City, OK, for Defendant.

### *ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION*

STEPHEN P. FRIOT, District Judge.

Plaintiff's Motion for Preliminary Injunction (doc. no. 10) came on for evidentiary hearing on December 20, 2012. The motion has been thoroughly briefed, and the parties have had the opportunity to complete the discovery necessary for thorough presentations at the hearing. For the reasons set forth in this order, the

court has concluded that the motion should be denied.

I. *Background Facts and The Parties' Contentions.*

Plaintiff is Planned Parenthood of Arkansas and Eastern Oklahoma d/b/a Planned Parenthood of the Heartland—Oklahoma, "PPAEO." Closely related to PPAEO is Planned Parenthood of the Heartland, "Heartland." PPAEO asks the court to preliminarily enjoin, under Rule 65, Fed.R.Civ.P., defendant's decision not to renew (also referred to in this order, for brevity, as the termination) PPAEO's contract with the Oklahoma State Department of Health which grants funds to PPAEO for the purpose of providing WIC services to the community.

Defendant is Dr. Terry L. Cline, Oklahoma's Commissioner of Health. As Commissioner, Dr. Cline is head of the Oklahoma State Department of Health (OSDH). He is also Oklahoma's Secretary of Health and Human Services.

WIC is the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC"), a federal grant program established by the Child Nutrition Act of 1966. The purpose of WIC is to provide supplemental foods and nutrition education to pregnant, postpartum, and breast-feeding women, infants, and young children up to age five from families with inadequate income who are at special risk with respect to their physical and mental health by reason of inadequate nutrition or health care, or both.

The Food and Nutrition Service of the United States Department of Agriculture, the "USDA," administers WIC and provides funds to the Oklahoma State Department of Health. OSDH, in turn, contracts with local agencies, including both public health departments and non-profit agencies, to provide WIC services to the community. PPAEO is one of the latter—a non-profit agency with which OSDH contracts for the purpose of providing WIC services to the community.

The State of Oklahoma has participated in the WIC program for more than twenty-five years.

PPAEO, which has participated in WIC for eighteen years, provides WIC services to women, infants, and children at three of its Tulsa-area health centers: Midtown, Westside, and Broken Arrow.

In September 2012, PPAEO provided WIC services for nearly 3,000 women, infants, and children. PPAEO's grant for federal fiscal year (FFY) 2012, beginning October 1, 2011, was $454,000.

The three PPAEO health centers in the Tulsa area provide a range of services in addition to WIC-related services to patients and participants. At Midtown and Broken Arrow, PPAEO offers prenatal care through the thirtieth week of pregnancy. At Midtown, PPAEO offers a family practice, including general adult family practice as well as pediatric care. All three centers also offer family planning services.

The WIC contract in question, between OSDH and PPAEO, provides that the contract will begin on October 1, 2010 and end on September 30, 2011, with a renewal option for four additional one-year periods. Per the contract, renewal of the contract is contingent upon the needs of OSDH, the contractor's performance and funding availability. The contract does not specify when the decision to renew or not renew must be made.

Although PPAEO does not provide abortions in Oklahoma, it does provide abortion referrals to pregnant patients and advocates for access to abortion. Additionally, PPAEO is affiliated with other Planned Parenthood entities that provide abortions or advocate for access to abortion.

PPAEO contends that the decision of the OSDH not to renew the WIC contract was driven, or at least substantially motivated by, political considerations arising from PPAEO's abortion-related activities. PPAEO accordingly contends that the decision not to renew the contract violated PPAEO's rights under the First Amendment and the Fourteenth Amendment.

Defendant contends that the decision to not renew PPAEO's WIC contract had nothing to do with PPAEO's advocacy for abortions, referrals to abortion providers, or affiliation with abortion providers. Defendant further contends that the officials involved in the decision not to renew PPAEO's contract knew that PPAEO and others would question the motivation behind the decision, and that publicity and litigation were probable.

If the WIC contract is allowed to terminate, PPAEO contends that it will need to lay off up to seven staff members and will likely close its Westside health center. Once PPAEO takes these actions, PPAEO contends that it will be very expensive, if not impossible, to resume normal operations.

Additionally, PPAEO contends that if the contract is allowed to terminate, PPAEO will not be able to provide critical WIC services to the nearly three thousand women, infants and young children who rely on them. PPAEO contends that these women and their families will face the challenge of trying to obtain their WIC benefits from another Tulsa provider, which will be difficult, if not impossible, for them in light of transportation challenges, decreased hours of operations, and other considerations.

## II. *Standards for Preliminary Injunctions.*

It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal. *Heideman v. South Salt Lake City,* 348 F.3d 1182, 1188 (10th Cir.2003). *Id.* at 1188, quotations and citations omitted.

The four requirements which must be satisfied before a court will enter a preliminary injunction under Rule 65, Fed.R.Civ. P., are reviewed in *Planned Parenthood of Kansas and Mid–Missouri v. Brownback,* 799 F.Supp.2d 1218, 1225 (D.Kan., 2011), a case which involved a challenge to state legislation impacting Title X funding to Planned Parenthood. The court stated as follows: [1]

> A preliminary injunction is an extraordinary equitable remedy which seeks to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). A party seeking injunctive relief must show [1] a substantial likelihood that it will prevail on the merits, [2] that absent the injunction it was suffer an irreparable injury, [3] the

**1.** In *Planned Parenthood of Kansas,* defendants made arguments regarding plaintiff's burden of proof at the preliminary injunction stage that are similar to the arguments made by the defendant in this action. In the Kansas case, Planned Parenthood sued the Governor of Kansas and the Kansas Department of Health and Environment, seeking to prevent the application and enforcement of recent Kansas legislation which had the effect of excluding Planned Parenthood from successfully applying to the KDHE for federal Title X family planning funding. Plaintiff moved for a preliminary injunction, seeking to enjoin defendants from any further enforcement or reliance on the legislation and directing defendants to allocate all Title X funding for fiscal year 2012 without reference to the legislation, and to provide continuation grant funding to the plaintiff. The court granted the injunction.

threatened injury outweighs the cost to its opponent, and [4] the injunction is not against the public interest. See *Westar Energy v. Lake,* 552 F.3d 1215, 1224 (10th Cir.2009); *Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1246 (10th Cir.2001).

*Planned Parenthood of Kansas* at 1225.

▉ It is the movant's burden to establish that each of the four factors tips in his favor. *Heideman* at 1188–89.

▉ The Tenth Circuit has identified three types of particularly disfavored preliminary injunctions, concluding that a movant must make a heightened showing to demonstrate entitlement to preliminary relief with respect to such injunctions. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,* 389 F.3d 973, 977 (10th Cir.2004). The categories of disfavored injunctions are: "(1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits." *Id.*[2]

▉ With respect to the first type, defendant concedes that the requested "injunctive relief would technically be preserving the status quo." Doc. no. 36, p. 16. The status quo is the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing. *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,* 269 F.3d 1149, 1155 (10th Cir.2001). The injunction sought by PPAEO, if granted, would keep the parties in the position they occupied when this dispute arose. Accordingly, it would not alter the status quo.

▉ Defendant argues the injunction is disfavored because it is a mandatory injunction, the second category of disfavored injunctions. With regard to mandatory injunctions, *O Centro* explains as follows. "Without regard to whether a mandatory preliminary injunction alters the status quo, ... it is still appropriate to disfavor such injunctions because they affirmatively require the nonmovant to act in a particular way, and as a result they place the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." *O Centro,* 389 F.3d 973 at 979.

Defendant contends that granting the injunction would require the court to superintend various decisions and communications between the parties, such as matters involving future budget adjustments, contract modifications, or the parties' handling of any future performance problems under the WIC contract. Doc. no. 36, p. 16. Plaintiff disagrees, arguing that the injunction it seeks is a narrow one which would not involve the court in superintending the relationship between the parties. Plaintiff argues that the injunction would go no further than to prohibit defendant from terminating the WIC contract with PPAEO for reasons related to PPAEO's constitutionally protected activity. Plain-

---

**2.** Defendant argues that the showing the movant must make in such cases is "heavy and compelling," but the Tenth Circuit no longer uses that standard. *Id.* at 976. Instead, the Tenth Circuit states that any preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course. *Id.* The Tenth Circuit also makes clear that movants seeking such an injunction are not entitled to rely on any relaxed standard for determining likelihood of success on the merits; rather, a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and may not rely on the modified likelihood-of-success-on-the-merits standard. *Id.* at 976.

tiff states that the injunction, if granted, would not preclude OSDH from altering, or even terminating, the contract, for any reasons unrelated to PPAEO's constitutionally protected activity. Doc. no. 42, p. 10.

In *Planned Parenthood of Kansas*, 799 F.Supp.2d 1218, 1226, the district court rejected defendant's argument that the preliminary injunction motion, if granted, would require extensive, court-supervised positive action by the defendants. That court stated that the motion sought relief which was primarily negative in character, seeking to require the defendants to prospectively act with respect to Title X funding without reference to reliance on the allegedly unconstitutional standards created by the legislation challenged in that case. *Id.* For that and other reasons, the court held that the requested injunction need not meet heightened "strong showing" standards applicable to disfavored injunctions. *Id.* at 1226–27.

Here, the requested injunction would require defendant to prospectively act conformably to constitutional standards with respect to non-renewal of the WIC contract between OSDH and PPAEO. It is a narrowly tailored request and would not require ongoing court supervision of the type that could cause the injunction to be characterized as disfavored. The requested injunction is not a disfavored mandatory injunction which might require ongoing court supervision to any significant degree.[3]

■ Defendant also argues that the injunction is disfavored because it would provide virtually all of the relief which plaintiff could obtain on the merits. The injunction, if granted, would keep PPAEO in the WIC program during the pendency of this case, unlike a permanent injunction entered at a trial on the merits. Also, the motion for preliminary injunction does not seek declaratory relief, a type of relief which is requested in the complaint.

■ Furthermore, as stated in *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247–48 (10th Cir.2001), there is no reason to disfavor a preliminary injunction simply because the plaintiff would get no additional relief if it prevailed at the trial on the merits; the only reason to disfavor a preliminary injunction that grants substantially all the relief sought is that it would render a trial on the merits largely or completely meaningless. *Id.* at 1247. Accordingly, the "all the relief to which a plaintiff may be entitled" requirement must be supplemented by a further requirement that the effect of the order, once complied with, cannot be undone. *Id.* at 1247–48.

The preliminary relief requested by PPAEO—reinstatement of the WIC contract for next year, pending trial—could be undone. It is not relief that would render a trial on the merits meaningless. *See, Planned Parenthood of Kansas*, 799 F.Supp.2d at 1227 (injunction not disfavored because, among other reasons, "There is nothing in the present action which suggests that the preliminary relief sought by Planned Parenthood, if granted, could not be undone."). The requested injunction is not disfavored for awarding substantially all of the relief that could be obtained at trial.

As the requested injunction does not fit within any of the three types of disfavored injunctions, it is not a disfavored injunction.

---

**3.** *But see, Schrier, M.D. v. University of Colorado*, 427 F.3d 1253, 1260–61 (10th Cir.2005) (court characterized as mandatory an injunction that would require the university to reinstall terminated chair of medical department, because court found that the relief requested required the university to act in a particular way and might require the court to provide supervision).

In any event, the court's conclusion regarding the "disfavored" issue is not determinative; the result stated in this order would be the same even if the injunction were found to be a disfavored one.

### III. *Likelihood of Success on the Merits.*

Plaintiff asserts violations of the First Amendment and of the Fourteenth Amendment, specifically, a violation of plaintiff's first amendment free speech and freedom of association rights based on defendant's decision not to renew plaintiff's WIC contract for the upcoming fiscal year as a result of plaintiff's constitutionally protected activities relating to abortion advocacy, referrals to abortion providers, and affiliation with abortion providers.[4]

PPAEO also asserts an equal protection violation of the Fourteenth Amendment, alleging that there was no legitimate reason for distinguishing PPAEO from every other WIC local agency whose WIC contracts were renewed by the defendant.

Importantly, for purposes of responding to the motion for a preliminary injunction, defendant does not dispute PPAEO's first amendment right to engage in abortion advocacy and counseling, citing *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Doc. no. 36, p. 17. Defendant does not dispute that if PPAEO's exercise of that right was a substantial or motivating factor in OSDH's decision not to renew the WIC contract, then plaintiff might be able to establish a substantial likelihood of success on the merits, citing *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996).[5] Doc. no. 36, p. 17. Defendant argues, however, that plaintiff cannot establish that link. Doc. no. 36, p. 18.

Moreover, in this case, the first amendment and equal protection claims depend upon the court's resolution of the same factual issue: the reason for the decision to not renew the WIC contract.[6] Thus,

---

**4.** Regarding first amendment rights, *see generally, Rust v. Sullivan*, 500 U.S. 173, 196, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), characterizing the Court's "unconstitutional conditions" cases as involving situations in which the government has placed a condition on the recipient of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program. *And see, Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) ("if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which (it) could not command directly.' [citation omitted]. Such interference with constitutional rights is impermissible."). *See also, Board of County Commissioners v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (First Amendment protects independent contractors from termination or prevention of automatic renewal of

at-will government contracts, in retaliation for their exercise of free speech).

**5.** In *Umbehr*, at p. 675, 116 S.Ct. 2342, a first amendment case, the Court stated: "To prevail, an employee must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination. If the employee discharges that burden, the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." (Here, the defendant has not argued the latter.)

**6.** *See, Hill v. Kemp*, 645 F.Supp.2d 992, 1006–07 (N.D.Okla.2009) (Oklahoma's statutory scheme for specialty license plates—which included, for example, "Choose Life"—challenged as unconstitutional; parties agreed that the first amendment and equal protection issues were intertwined; court stated that to the extent that claims are intertwined, the First Amendment provides the proper framework; however, the plaintiff also asked the court to apply a traditional equal protection analysis and the court went on to determine

the court's findings and conclusions with respect to the first amendment claim will effectively control its resolution of the equal protection claim, which turns on whether the reason for singling out PPAEO by the decision not to renew the WIC contract was a legitimate (constitutional) reason.

As shown, the parties' briefs indicate no real dispute regarding the parameters of constitutional versus unconstitutional conduct. Instead, their entire focus is the weight and credibility of their evidence intended to show, from PPAEO's perspective, that there was an unconstitutional basis for the decision not to renew the WIC contract, and intended to show, from defendant's perspective, that the decision was based entirely on permissible considerations relating to PPAEO's performance and responsiveness.

### IV. Whether Movant Will Suffer Irreparable Injury Absent the Injunction.

■ A showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir.2004).

■ Any party's loss of first amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The Tenth Circuit has noted that to the extent that first amendment rights are infringed, irreparable injury is presumed. *Community Communications Company, Inc. v. City of Boulder, Colo.*, 660 F.2d 1370, 1376 (10th Cir.1981).[7]

### V. Whether Threatened Injury Outweighs Cost to the Opponent.

The plaintiff has an interest in prevention of violations of its constitutional rights, whereas the defendant has no interest in being allowed to act in an unconstitutional manner.

### VI. The Public Interest.

■ The public has an interest in constitutional rights being upheld and in unconstitutional decisions by the government being remedied. *See, Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir.2012) (Sharia law case, quoting rule that it is always in the public interest to prevent the violation of a party's constitutional rights). *And see, Planned Parenthood Association of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir.1987) (no substantial harm in preventing city from enforcing ordinance that was likely to be found unconstitutional, as the state has no valid interest in enforcing an unconstitutional ordinance).

### VII. Findings of Fact.

■ Seven witnesses testified at the hearing. There were few, if any, direct conflicts in the testimony, and no material conflicts. The factual dispute in this case pits the inferences that PPAEO asserts should be drawn from essentially undisputed facts against the affirmative testimony of OSDH's mid-level and senior managers to the effect that impermissible considerations played no role in the termination decision. Thus, unlike many of the cases in which Planned Parenthood has found it necessary to seek judicial relief, the existence of animus against Planned Parent-

---

whether strict scrutiny or rational basis test applied; finding no first amendment violation, the court applied a rational basis test and held the statute rationally related to a legitimate state interest.)

7. In addition to constitutional harms, other harms will also be material with respect to each of the "harm" factors, such as the impact on PPAEO, and on its clients, absent a preliminary injunction.

hood on the part of the relevant decision makers is very much in issue in this case.

Sixteen clinics in the Tulsa area, including three operated by PPAEO, provide WIC services. PPAEO's WIC funding from OSDH amounts to six percent of PPAEO's revenue.

PPAEO has been a WIC contractor for eighteen years, but the events that are decisive in this case began to unfold early in 2011 and continued into the fall of 2012.

PPAEO acknowledges that there were problems with its performance in the WIC program in 2011 and 2012. PPAEO asserts, however, that those problems were but a pretext for the termination and that the termination was actually the result of political considerations flowing from PPAEO's abortion-related activities. As relevant here, the performance problems arose in 2011. On the OSDH side, the first significant events occurred in late January, 2012, when matters relating to PPAEO were discussed among senior managers in OSDH. By PPAEO's account, these discussions were the first identifiable occurrences from which impermissible political motivations should be inferred. From the perspective of OSDH, these discussions were the beginning of the end of PPAEO's prospects for renewal, because Julie Cox–Kain, Chief Operating Officer of OSDH, came away from these discussions with a decidedly negative impression, on the merits, of PPAEO's performance as a contractor in the WIC program—an impression that had serious consequences for PPAEO late in the summer of 2012.

In either scenario (politically motivated termination or termination for poor performance), a central player is Terry Bryce,

Chief of OSDH's WIC Service. Bryce has 20 years of experience with the WIC program, and is the Chairman of the Board of the National WIC Association. Although Bryce did not make the final termination decision, he was, as a result of his dealings with his OSDH superiors and subordinates, directly involved in most of the relevant events, including the termination decision.[8]

Richard Woofter is the Contract Monitor (sometimes referred to as a Contract Specialist) for OSDH's WIC Service. He has been employed in that capacity for at least ten years. He is responsible for numerous administrative tasks relating to the WIC program, including reviewing invoices from contractors like PPAEO, reviewing budgets, and serving as a liaison with WIC contractors. He deals with fifteen contractors, including PPAEO.

Bryce and Woofter described the administrative and performance-related difficulties that OSDH encountered with PPAEO in 2011 and 2012. Their testimony was credible. Their dedication to the WIC program was obvious. They would have been hard put to conceal any belief that the termination was motivated by political or other impermissible considerations.

In early 2011, OSDH encountered difficulties in getting PPAEO to respond to requests for information. This problem progressed to the point that OSDH had to threaten to withhold payments in order to get the requested information. In April, 2011, OSDH's internal auditors sent a letter to PPAEO, requesting clarification and documentation relating to several items included in PPAEO's January, 2011 invoice to OSDH. DX 8(519).[9] The requested in-

---

**8.** At the top of the OSDH hierarchy relevant to this case is Commissioner Terry L. Cline. Reporting to Dr. Cline were Chief Operating Officer Julie Cox–Kain and Deputy Commissioner for Family and Community Services Stephen Ronck. Terry Bryce reported to Ronck. Carrie Zeman reported to Bryce, and Richard Woofter reported to Zeman.

**9.** Numbers in parentheses are references to Bates numbering of pages in the exhibits.

formation was not forthcoming within a reasonable time. Problems with PPAEO's responsiveness continued into the fall of 2011. On October 14, OSDH's internal auditors sent a detailed memo to Bryce, laying out the still-outstanding discrepancies re: the January invoice, which, annualized, amounted to more than $86,000. *Id.* (516–518). Twelve days later, Bryce called Stephanie Zahner, with PPAEO in Tulsa, to remind her that audit-related requests were still outstanding. *Id.* (530). Zahner was a human resources director who was attempting to cover accounting and other administrative functions at PPAEO due to understaffing at PPAEO. Zahner promised to work on the problem. A partial response, which raised still more questions (none of which appear to be contrived), was received by OSDH on November 17. *Id.*

Meanwhile, the 2012 federal fiscal year was in progress. PPAEO's contract with OSDH for FFY 2012 (beginning October 1, 2011) had been routinely renewed by OSDH. This renewal is usually followed in short order by the contractor's provision of detailed budget information for the new contract year. On November 30, 2011, two months into FFY 2012, Woofter sent an email to PPAEO, reminding PPAEO that documentation was still needed for the FFY 2012 budget renewal. *Id.* (539). He requested a budget justification, a cost allocation plan, proof of insurance coverages, and licensure information for PPAEO's nutritionist. This November 30 email was "at least the third or fourth reminder" to PPAEO. *Id.* (530). After the first of the year, 2012, the necessary information was still not forthcoming. On March 16, 2012, nearly six months into the contract year, Bryce sent a pointed letter to David Albers, Senior Accountant for Heartland, asking for the previously-requested documentation of the budget justification and cost narrative. *Id.* (531), DX 39. As authorized by the contract, Bryce threatened to

withhold contract payments if the information was not provided within 30 days from March 19. *Id.* The information was not provided until May, 2012. No other contractor was this delinquent in providing budget information.

As for the audit issues, on December 15, 2011, Bryce emailed Angela Axdahl, at Heartland, in an attempt to get a response. DX 33. (Due to the problems with responsiveness at PPAEO, Bryce had been referred to Axdahl.) This effort was unavailing. On December 19, 2011, OSDH reduced PPAEO's September invoice by the amount that was in controversy for the January invoice, discussed above. DX 34. This was communicated to PPAEO by way of an email from Woofter to Zahner on December 19, in which Woofter pointed out that OSDH was closing its books for FFY 2011 (which had ended on September 30, 2011), the requested information had still not been provided, and OSDH was therefore reducing PPAEO's payment for its September invoice in the amount outstanding re: the January, 2011 invoice. *Id.* (534). Woofter's email was copied to his superior, Zeman, and to her superior, Bryce—which would have eliminated any perception on the PPAEO side that this email was a routine bureaucratic message. Significantly, Bryce's receipt of this email also eliminates any question as to whether, at the end of 2011, Bryce was aware that the significant administrative problems OSDH was having with PPAEO were still unresolved. This, in turn, sheds light on what was on Bryce's mind when he discussed PPAEO with Cox–Kain, OSDH's Chief Operating Officer, in late January, 2012.

Some of the difficulties with PPAEO's responsiveness occurred during a period in which PPAEO was undergoing a reorganization, which ultimately resulted in what Heartland called a consolidation of PPAEO

with Heartland—a process that began with a reduction in force at PPAEO in July, 2011, and was, at the entity level (if not in terms of organizational effectiveness), completed as of January 1, 2012.[10] DX 31. OSDH repeatedly requested information about this reorganization from PPAEO, as early as August, 2011, but did not get a definitive response until mid-December. At one point, PPAEO asserted that it had no obligation to send the requested information. It is not normal for OSDH to have this kind of a problem in dealing with a contractor. DX 22, 27, 28, 31.

Also relevant to OSDH's treatment of PPAEO is the fact that, during the last two years, PPAEO's WIC caseload has been declining. It has declined more than caseloads have generally declined across the state. For FFY 2012, PPAEO's caseload declined by 14 percent. Another Tulsa County contractor, Morton (with one clinic), experienced a 23 percent decline in caseload for the same period, but PPAEO's decline was the largest for a large clinic in the Tulsa area. PX 5, 27.

PPAEO's Tulsa area clinics had three of the ten largest caseload declines for February 2011 through January 2012, versus the same period in 2010–11. DX 36. In March, 2012, Bryce emailed Sherry Lathan, PPAEO's WIC program manager in Tulsa, offering to do "anything we can do to assist with the caseload performance for [PPAEO's] three sites." DX 36. Upon receipt of Bryce's email, Lathan emailed Axdahl, at Heartland, telling Axdahl that she had called Bryce to explain to him that they were one "certifier" short, which affected all three sites.[11] DX 38. She also told Axdahl that Bryce had reminded her that "with the caseload dropping, it could affect our funding." *Id.* PPAEO's case-

load decline was at least partially the result of this certifier vacancy that went unfilled for eight months, from October, 2011 to June, 2012, leaving PPAEO to cover three locations with two certifiers. PPAEO tried to fill the gap with a dietician who was already on staff, but, as described by Lathan, PPAEO's Tulsa WIC program manager, the dietician could not do both her job and the certifications that needed to be done. WIC certifiers have a leading role in providing WIC services to WIC participants. Bryce credibly differentiated Morton from PPAEO by explaining that Morton was responsive to OSDH's concerns about caseload and in "letting us know what their intentions were" to solve the problem.

PPAEO continued to be in the top ten in caseload decline in July and August, 2012. Caseload declines are significant in two ways. They mean that the contractor is serving fewer people, and they increase the contractor's cost per participant.

OSDH's concerns about PPAEO's performance and responsiveness, having begun in 2011, and continuing into the late summer of 2012, provide the backdrop for communications which took place at the senior management level in OSDH in January, 2012, and later in the year when the termination decision was made.

In January, 2012, an Oklahoma State Representative, Jason Murphey, authored, or at least advocated, a bill (HB 2276) that would have prevented the OSDH WIC program from contracting with any entity that engaged in specified abortion-related activities.[12] PX 49 (0135). Bryce believed that this bill was probably aimed at Planned Parenthood. Bryce prepared an

---

**10.** The consolidation was accomplished on the advice of a Planned Parenthood accreditation team which assessed the performance of PPAEO as a Planned Parenthood affiliate.

**11.** A certifier is a Certified WIC Nutrition Technician.

**12.** The bill never became law.

analysis of the bill and emailed that analysis to Carol Spradlin, assistant to Mark Newman, OSDH's Director of State and Federal Policy. PX 49. The email was sent at 12:59 p.m. on January 23. *Id.* Newman was OSDH's legislative liaison. In his analysis, Bryce noted the funding restrictions that the bill would have imposed and observed that "[t]he new ownership PP of the Heartland does have other locations which perform abortions." *Id.* (0135).

At mid-morning the next day, John McPhetridge, an aide to a State Representative, emailed Newman, asking about "state funds that make their way to Planned Parenthood." PX 38 (0398–99). The email indicated some awareness that Planned Parenthood provided some non-abortion services, "related to womens [sic] health" in the Tulsa area. *Id.* Less than three hours later, Newman responded to McPhetridge, with a copy to Bryce and Spradlin, informing McPhetridge that Planned Parenthood received no state money: "Only federal WIC funds through a contract with PP in Tulsa." *Id.* (0398). About an hour later, Spradlin, assistant to OSDH's legislative liaison Newman, emailed Bryce (with a copy to Newman and to Ronck, Bryce's supervisor), asking Bryce to "contact John McPhetridge on this issue." *Id.* Later that afternoon (January 24), Bryce forwarded to Cox–Kain, the Chief Operating Officer, his email from the day before, by which he had provided his analysis of HB 2276 to Spradlin, the assistant to Newman. PX 49 (0134). About a half hour after that, Bryce sent an email to Spradlin, with copies to Cox–Kain, Ronck and Newman, giving Spradlin a recap of his conversations with McPhetridge in which he had informed McPhetridge of some particulars of OSDH's relationship with PPAEO—matters such as the amount of the contract, what that pays for, and the fact that he, Bryce, was not aware of other agencies doing business with Planned Par-

enthood. Relevant to HB 2276, Bryce also reported that he had told McPhetridge that he, Bryce, was "not aware of any other state WIC Programs not allowed to contract with Planned Parenthood," and that he had contacted the National WIC Association (of which Bryce is the Chairman of the Board) and was advised that they were not aware of such a prohibition in any other state. PX 38 (0397–98). At 4:00 p.m., Newman, having received his copy of Bryce's latest email to Spradlin, sent Bryce an email thanking him (presumably for his work in responding to McPhetridge).

By the time this series of emails was completed, the legislative inquiry had been responded to, the House bill had been analyzed, McPhetridge had been told, in substance, that if Oklahoma prohibited the WIC program from contracting with Planned Parenthood, it would be the only state to do so, and Cox–Kain was kept abreast of the substance of these communications about a bill that never became law. The next day, January 25, Bryce made a note to "talk to Steve [Ronck] concerning conversation w/Julie [Cox–Kain] (Planned Parenthood)." PX 24(536). Bryce testified that this conversation with Cox–Kain related to the administrative problems OSDH was having with PPAEO. Cox–Kain also recalled that this conversation related to the administrative issues— and those issues were very much alive in late January, less than a month after the effective date of the consolidation and with the longstanding audit- and budget-related information requests still begging for responses. This January 25 conversation is the conversation that caused Cox–Kain to testify that "my feeling [in August] from January was that we would be likely not renewing the Planned Parenthood contract."

PPAEO seeks to link the January 25 conversation between Bryce and Cox–Kain

to the legislative issue rather than to the administrative problems OSDH had been having with PPAEO. Doc. no. 54, at 2. The inference would be that if anything planted the seed in Cox–Kain's mind that OSDH should get rid of PPAEO, it was legislative pressure, not the performance and administrative problems OSDH had been having with PPAEO. Whether or not the legislative issue was one of the topics discussed in the January 25 conversation (which would have been entirely unremarkable in the circumstances), Cox–Kain flatly denies that pressure from any source, or any considerations relating to Planned Parenthood's abortion-related activities, drove her decision, in September, 2012, to terminate the relationship. This denial is credible. It strains credulity to suppose that a team of seasoned OSDH administrators, deeply committed to their programs, would be cowed by inquiries as tepid as this, relating to pending legislation that went nowhere. On some issues, including abortion, there is nothing subtle about Oklahoma politics or Oklahoma politicians. The fact of the matter is that the legislative activity, and the related inquiries, in January, 2012, did not amount to much.

The termination decision was made in September, 2012. Before the end of August, the initial administrative steps necessary to accomplish renewal had been completed. Woofter had completed a checklist that served as a preliminary screening tool. PX 21. Over the signatures of Woofter, Zeman, Bryce and Ronck, PPAEO's proposed budget for FFY 2013 was approved. PX 22. PPAEO's contract, along with eight other WIC contracts, had been sent to OSDH's procurement services office for approval. PX 23. Woofter recalls no other instance in which a contract was terminated after being sent to the procurement services office.

In essence, by late August, the routine prerequisites to renewal had been completed. But one non-routine matter was in the mix, and that was Cox–Kain's negative impression from January. Before the end of August, Cox–Kain called Bryce "to confirm that we were not renewing Planned Parenthood." She recalled that, after her January conversation with Bryce, she "felt that non-renewal was a good option." Bryce confirmed to Cox–Kain that PPAEO had had a significant reduction in caseload and that there had been "prolonged issues" with "responsiveness to the department." Bryce recommended that the contract not be renewed. No pressure was applied to Bryce to make that recommendation. Soon after her conversation with Bryce, Cox–Kain discussed the matter with Deputy Commissioner Ronck, Bryce's supervisor. Cox–Kain and Ronck agreed that the contract should not be renewed.[13]

Before the final decision was made, Cox–Kain, or Ronck, or both, discussed the matter with the Commissioner, Dr. Cline. Cline explained that he was consulted because he has a "no surprises" policy on high profile issues, and PPAEO was a high profile contractor. Cline does not recall when the decision was made, but he knows that he was involved before the decision was made.

Bryce found out about the final decision from Ronck. Although Bryce had recommended termination, he knew that there would be a downside. He expected that the termination of PPAEO would result in an open records request and litigation.[14]

13. Woofter disagreed. OSDH is no more bound by Woofter's personal disagreement with the termination decision than PPAEO is bound by Sherrie Lathan's belief that the contract was terminated because of the drop in caseload.

14. He had good reason to expect litigation. See, e.g. the following cases cited by PPAEO

His concerns were such that Woofter got the impression that Bryce disagreed with the decision. Bryce knew that OSDH's decision on this "high profile" issue, as Cline called it, would have to be defended and that the laboring oar would fall to him, as Chief of OSDH's WIC Service.

Woofter testified, credibly, that after the termination decision was made, Bryce asked him to do some research to identify the states in which Heartland engages in abortion related activities and to get current information as to "cost per participant, participants, staff caseload, that sort of information." Woofter did the research and reported the results to Bryce.

By late September, Bryce was ready to inform PPAEO of the termination decision. On September 25, he sent an email to Cox–Kain, telling her that "I have contacted Planned Parenthood and informed them that we are *not* going to renew their current contract. I gave them several reasons all of which are true:" Bryce then

listed (i) uncertainty about WIC funding, (ii) PPAEO cost per participant, (iii) PPAEO's decrease in caseload, (iv) proximity of other clinics, and (v) OSDH's prerogative to terminate on the basis of the needs of OSDH, the contractor's performance, and funding availability.[15] PX 27. By listing his proffered reasons, "all of which are true," it might be inferred that Bryce was simply concocting a list of post-hoc rationalizations[16] for a decision that rested on impermissible political considerations. The court rejects this inference because Bryce's listing of these reasons is entirely consistent with the defensive posture that he, and his agency, were in. To be sure, some of Bryce's listed reasons had more impact on the decision than others, and some (such as funding uncertainty) were not unique to PPAEO, but they were not contrived after the fact. The same considerations explain Bryce's request to Woofter, after the decision was made, to research Heartland's abortion related activities[17] and get current information

---

in its memorandum in support of the present motion: *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati,* 822 F.2d 1390 (6th Cir.1987); *Planned Parenthood of Minn. v. Minnesota,* 612 F.2d 359 (8th Cir.1980); *Planned Parenthood Greater Memphis Region v. Dreyzehner,* 853 F.Supp.2d 724 (M.D.Tenn. 2012); *Planned Parenthood of Cent. N.C. v. Cansler,* 804 F.Supp.2d 482 (M.D.N.C.2011); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health,* 794 F.Supp.2d 892 (S.D.Ind.2011); *Planned Parenthood of Kan. & Mid–Mo. v. Brownback,* 799 F.Supp.2d 1218 (D.Kan.2011) and *Planned Parenthood of Kan., Inc. v. City of Wichita,* 729 F.Supp. 1282 (D.Kan.1990).

**15.** Bryce also wrote that he told PPAEO that he was working with the Tulsa City County Health Department (TCCHD), an autonomous local health department, to determine whether TCCHD "would be interested in sub contracting." PX 27. At one point, it had occurred to Cox–Kain that OSDH should look into the possibility of contracting with TCCHD for all WIC services in Tulsa. Cline authorized her to look into this. Perhaps

because this notion reached Bryce through Ronck, Bryce mistook it to be a suggestion that TCCHD subcontract with PPAEO to do essentially what PPAEO had been doing directly for OSDH (PX 25)—the benefit being that OSDH could thereby reduce its administrative burden and get closer oversight. This idea was a nonstarter with TCCHD (PX 26) and caused serious concern on the part of OSDH's procurement office because of the appearance that OSDH would be entering into a contract with a governmental agency for the prohibited purpose of funneling funds to a nongovernmental agency, circumventing competitive bidding requirements. PX 52.

**16.** PPAEO has asserted that OSDH has given inconsistent reasons for the termination. The court does not agree. Providing *more detailed* information, as OSDH has done, is not the same as providing *inconsistent* information.

**17.** Bryce had been asked about this in the past. In this instance, he made a note of the results of Woofter's research (PX 42(541)) and that was the end of it.

about PPAEO's performance. Bryce, and the management echelons above him, had good reason to inform themselves about all aspects, legally relevant or not, of a contentious public dispute that was certain, and soon, to follow.

## CONCLUSION

PPAEO's performance deficiencies (primarily caseload declines) do not, standing alone, strike the court as problems that would have been fatal to the relationship. But a routine, solvable problem can become a justifiable basis for strong action when it is compounded by persistent unresponsiveness in addressing the challenge. Moreover, the frustrations in getting information out of PPAEO on what should have been routine administrative matters rubbed additional salt into the wound. One of the unquestionable advantages of providing services through independent contractors is that the funding agency can rid itself of poor or uncooperative performers relatively easily, albeit subject to constitutional and statutory constraints.

The evidence before the court is not free of ambiguities, which is why the court commented at the end of the hearing that the right answer is not obvious. Having carefully considered all of the evidence presented by two well-represented parties, the court is persuaded that PPAEO has failed to establish that there is a substantial likelihood that it will prevail on the merits of the pivotal issue of whether the termination decision was based on impermissible factors such as the advocacy and other abortion-related activities of Heartland or PPAEO.

PPAEO's Motion for Preliminary Injunction, doc. no. 10, is accordingly **DENIED.**