RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0264p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PRETERM-CLEVELAND; PLANNED PARENTHOOD SOUTHWEST OHIO REGION; WOMEN'S MED GROUP PROFESSIONAL CORPORATION; ROSLYN KADE, M.D.; PLANNED PARENTHOOD OF GREATER OHIO,

　　　　　　　　　　*Plaintiffs-Appellees*,

　　　　*v.*

LANCE HIMES, Director, Ohio Department of Health; KIM G. ROTHERMEL, Secretary, State Medical Board of Ohio; BRUCE R. SAFERIN, Supervising Member, State Medical Board of Ohio,

　　　　　　　　　　*Defendants-Appellants*.

No. 18-3329

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:18-cv-00109—Timothy S. Black, District Judge.

Argued:  January 30, 2019

Decided and Filed:  October 11, 2019

Before:  COLE, Chief Judge; BATCHELDER and DONALD, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Benjamin M. Flowers, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants.  B. Jessie Hill, ACLU OF OHIO FOUNDATION, INC., Cleveland, Ohio, for Appellees. **ON BRIEF:**  Steven T. Voigt, Tiffany L. Carwile, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants.  B. Jessie Hill, Freda J. Levenson, ACLU OF OHIO FOUNDATION, INC., Cleveland, Ohio, Alexa Kolbi-Molinas, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Carrie Y. Flaxman, PLANNED PARENTHOOD FEDERATION OF AMERICA, Washington, D.C., Jennifer L. Branch, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, Melissa Cohen, PLANNED PARENTHOOD FEDERATION OF AMERICA, New York, New York, for

Appellees. Michelle K. Terry, AMERICAN CENTER FOR LAW & JUSTICE, Franklin, Tennessee, Misha Tseytlin, STATE OF WISCONSIN DEPARTMENT OF JUSTICE, Madison, Wisconsin, Brandon D. Harper, O'MELVENY & MEYERS LLP, Washington, D.C., Justine Lara Konicki, KOHRMAN JACKSON & KRANTZ, Cleveland, Ohio, Elise Porter, Columbus, Ohio, for Amici Curiae.

DONALD, J., delivered the opinion of the court in which COLE, C.J., joined. BATCHELDER, J. (pp. 10–14), delivered a separate dissenting opinion.

––––––––––––––––––

## OPINION

––––––––––––––––––

BERNICE BOUIE DONALD, Circuit Judge. Before us is an appeal from the district court's grant of a preliminary injunction against Defendants, enjoining them from implementing or enforcing Ohio law H.B. 214. As enacted, H.B. 214 prohibits an abortion provider from performing an abortion with the knowledge that the decision to abort arises from a diagnosis or indication that the unborn child has Down Syndrome. Plaintiffs, various abortion providers, sued Defendants, the state officials responsible for implementing and enforcing Ohio law H.B. 214, alleging H.B. 214 unconstitutionally inhibits pre-viability abortions based on a woman's reason for seeking the abortion. The district court granted the preliminary injunction after concluding that Plaintiffs had shown a likelihood of success on the merits. For the following reasons, we **AFFIRM** the district court.

**I.**

H.B. 214 was signed into law on December 22, 2017. H.B. 214 amends Section 3701.79 of the Ohio Revised Code and enacts Sections 2919.10 and 2919.101. Section 2919.10 prohibits any person from purposefully performing or inducing or attempting to perform or induce an abortion if the person has knowledge that the pregnant woman is seeking the abortion, in whole or in part, because of any of the following: (1) a test result indicating Down Syndrome in an unborn child; (2) a prenatal diagnosis of Down Syndrome in an unborn child; or (3) "any other reason to believe" that an unborn child has Down Syndrome. Ohio Rev. Code § 2919.10(B). Violation of Section 2919.10 constitutes a fourth-degree felony, punishable by up to 18 months in prison. Ohio Rev. Code §§ 2919.10(C) and 2929.14(A)(4). Section 2919.10 further requires

the state medical board to revoke the license of a physician who violates it and makes that physician liable in a civil action for compensatory and exemplary damages. Ohio Rev. Code §§ 2919.10(D), (E).

Section 2919.101 requires that the performing physician attest in writing that he or she is not aware that fetal Down Syndrome is a reason for the woman's decision to terminate. Ohio Rev. Code § 2919.101(A). Additionally, Section 2919.101 requires the Ohio Department of Health to adopt rules to "assist in compliance with" Section 2919.101 within 90 days of its effective date. Ohio Rev. Code § 2919.101(B).

On February 15, 2018, Plaintiffs filed their complaint in the district court, alleging that H.B. 214 violates Plaintiffs' patients' rights to liberty and privacy, guaranteed by the Fourteenth Amendment, because the law prohibits pre-viability abortions based on the woman's reason for seeking the care. The complaint sought, *inter alia*, declaratory judgment that the laws amended and enacted by H.B. 214 are facially unconstitutional. At the time of filing, Plaintiffs also filed a motion for preliminary injunction declaring H.B. 214 unconstitutional and enjoining all Defendants from enforcing or complying with H.B. 214. The district court granted Plaintiffs' motion, finding that under *Roe* and *Casey*, a woman is expressly and unambiguously entitled to a pre-viability right to choose whether to terminate or continue her pregnancy.

## II.

To determine whether to grant a preliminary injunction, trial courts consider and balance four factors: (1) the likelihood that the moving party will prevail on the merits; (2) whether the moving party will be irreparably harmed absent the injunction; (3) the prospect that others will be substantially harmed if the court grants the injunction; and (4) the public interest in granting the injunction. *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc). These factors are not prerequisites requiring satisfaction, but rather "interrelated considerations" that the court must balance. *Concerned Pastors for Soc. Action v. Khouri*, 844 F.3d 546, 548–49 (6th Cir. 2016). "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will

be the determinative factor.'" *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)).

On appeal from a grant or denial of a preliminary injunction, we review "the District Court's legal rulings *de novo* . . . and its ultimate conclusion [whether to issue a preliminary injunction] for abuse of discretion." *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 454 (6th Cir. 2014) (internal quotation marks omitted). While a "factual or legal error may alone be sufficient to establish that the court 'abused its discretion' in making its final determination . . . in the absence of such an error the district judge's weighing and balancing of the equities should be disturbed on appeal only in the rarest of cases." *NAACP v. City of Mansfield*, 866 F.2d 162, 166 (6th Cir. 1989) (quoting *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 674 (7th Cir. 1987)).

Defendants argue that the panel should reverse the district court's decision because the district court applied an erroneous legal standard by creating an "absolute" or "categorical" right to a pre-viability abortion. In support of their argument, Defendants point to language in *Roe v. Wade* where the Supreme Court expressly rejected the claim that the right to abortion is "absolute" and therefore entitles a woman to obtain an abortion "for whatever reasons she alone chooses." 410 U.S. 113, 153 (1973). Under this reading of *Roe*, Defendants argue that the district court erred in treating the right to a pre-viability abortion as a "categorical" right that precludes any limitations based upon the reasons for the abortion. Instead, Defendants ask this Court to find that their alleged state interest in preventing discrimination based on a disability does not fall under *Roe* and *Casey* because in neither case did the Supreme Court consider such an interest. Defendants assert that instead, a strict scrutiny analysis should have been applied to determine whether the state's interest in preventing discrimination against persons with Down Syndrome outweighs a woman's right to privacy. Defendants argue that under a strict scrutiny analysis, Plaintiffs have not shown a likelihood of success on the merits because Ohio has compelling interests in protecting those with Down Syndrome, the integrity of the medical profession, and the Down Syndrome community and its civic voice.

**A.**

We first address Defendants' argument that *Roe* and *Casey* do not control here. Though the Constitution does not explicitly provide for any right of privacy, the Supreme Court has recognized that "a right of personal privacy, or a guarantee of certain areas or zones of privacy" is rooted in varying contexts under several Amendments to the Constitution. *Roe*, 410 U.S. at 152. This includes a woman's decision whether to terminate her pregnancy. *Id.* at 153. While the *Roe* Court found that a woman's decision to obtain an abortion is a fundamental right, the Court also acknowledged that "this right is not unqualified and must be considered against important state interests in regulation." *Id.* at 154. In *Roe*, the Court explained that, "a State may properly assert important interests in safeguarding health, in maintaining medical standards, and in protecting potential life" that "[a]t some point in pregnancy . . . become sufficiently compelling to sustain regulation of the factors that govern the abortion decision." *Id.* The Court then considered the interests set forth by the State and determined when these interests become sufficiently compelling:

> With respect to the State's important and legitimate interest in the health of the mother, the 'compelling' point, in the light of present medical knowledge, is at approximately the end of the first trimester . . . It follows that, from and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health.
>
> . . .
>
> With respect to the State's important and legitimate interest in potential life, the 'compelling' point is at viability. This is so because the fetus then presumably has the capability of meaningful life outside the mother's womb. State regulation protective of fetal life after viability thus has both logical and biological justifications. If the State is interested in protecting fetal life after viability, it may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother.

*Id.* at 163–64.

Nearly twenty years later, the Court in *Planned Parenthood of Southeastern Pennsylvania v. Casey* upheld the *Roe* Court's holding, confirming that: "[t]he woman's right to terminate her pregnancy before viability is the most central principle of *Roe v. Wade*. It is a rule of law and a component of liberty we cannot renounce." 505 U.S. 833, 871 (1992). Moreover,

the Court in *Casey* drew the line between a woman's privacy right and the state's interest in the potential life of a fetus at viability, explaining that "[b]efore viability, the State's interests are not strong enough to support a prohibition of abortion . . . Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Id.* at 846, 879.

Under *Roe* and *Casey*, it is clear that a law which furthers a state's interest in protecting the women's health or potential life, "may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 878–79 (explaining that a state may enact rules and regulations governing abortions so long as the regulation does not impose an "undue burden" on a woman's right to a pre-viability abortion). This right is categorical.[1] *See Planned Parenthood of Ind. and Ken., Inc. v. Comm'r of the Ind. State Dep't of Health*, 888 F.3d 300, 311 (7th Cir. 2018) (Manion, J., concurring) ("But the fact remains that *Casey* has plainly established an absolute right to have an abortion before viability. The joint opinion says that *nothing* can stand between a woman and her choice of abortion before viability." (emphasis in original)).

Defendants attempt to place H.B. 214 outside the scope of *Roe* and *Casey* by asserting an interest in preventing discrimination and arguing that *Roe* and *Casey* apply only to the state's interest in the woman's health and potential life. This argument lacks rigor and is deceptive in its construction. The Supreme Court has made clear that, before viability, the state's purported reason for prohibiting a woman from obtaining an abortion is not dispositive. *See Casey*, 505 U.S. at 877 ("[A] statute which, while furthering the interest in potential life *or some other valid*

---

[1]Defendants argue that treating the right to abortion as categorical and absolute improperly provides greater protection to abortion rights than other constitutional rights. In doing so, Defendants compare the right to abortion to the right to freedom of speech. However, such a comparison is inaccurate. Freedom of speech is more accurately compared to the right to privacy, the umbrella under which the right to abortion is found. Accordingly, the right to an abortion is more accurately compared to a specific right under freedom of speech, such as the freedom from being compelled by the state to deliver a government-mandated ideological message. *See Janus v. Am. Fed'n of State, Cty., & Mun. Emps, Council 31*, 138 S. Ct. 2448, 2463–64 (2018); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). As the Court has made clear regarding this right, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us." *Barnette*, 319 U.S. at 642. Just as the right to be free from government coercion of ideological speech by private individuals is categorical, so too is the right to a pre-viability abortion.

*state interest*, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.") (emphasis added); *id.* at 879 ("[A] State may not prohibit *any woman* from making the ultimate decision to terminate her pregnancy before viability.") (emphasis added).

The *Casey* Court recognized that the right to obtain an abortion is "unique to the human condition and so unique to the law." 505 U.S. at 852. As the Court explained:

> The mother who carries a child to full term is subject to anxieties, to physical constraints, to pain that only she must bear. That these sacrifices have from the beginning of the human race been endured by woman with a pride that ennobles her in the eyes of others and gives to the infant a bond of love cannot alone be grounds for the State to insist she make the sacrifice. Her suffering is too intimate and personal for the State to insist, without more, upon its own vision of the woman's role, however dominant that vision has been in the course of our history and our culture. The destiny of the woman must be shaped to a large extent on her own conception of her spiritual imperatives and her place in society.

*Id.*

Within the abortion context, the state's purported interest in preventing discrimination in this case is inescapably intertwined with the state's interest in potential life in *Roe* and *Casey*. Without the potential life, there would be no interest in preventing discrimination. To give credence to the argument that an interest such as preventing discrimination or stigma may lay outside the interest in potential life and be considered separately to determine a women's rights to abortion would be to ignore the unique condition of abortion recognized in *Casey*. *See Planned Parenthood of Ind. and Ken., Inc.*, 888 F.3d at 307 ("It is entirely inconsistent to hold that a woman's right of privacy to terminate a pregnancy exists if a woman decides before she becomes pregnant that she does not want to bear a child, but that the State can eliminate this privacy right if a woman later decides she wants to terminate her pregnancy for a particular purpose."). Accordingly, we conclude that H.B. 214 is subject to the precedent set forth in *Roe* and *Casey* and, therefore, the state's interest in preventing discrimination does not become compelling until viability.[2]

---

[2]Defendants additionally argue that they have an interest in protecting the integrity of the medical profession. However, this asserted interest falls clearly under *Roe* and *Casey*. *Roe*, 410 U.S. at 154 (recognizing

**B.**

We next address the four factors used to determine whether the district court appropriately granted the preliminary injunction. First, having concluded that *Roe* and *Casey* control, Plaintiffs have clearly shown a strong likelihood of success on the merits. Even though, as Defendants note, H.B. 214 limits only a small subset of pre-viability abortions, because H.B. 214 has both the purpose and effect of prohibiting certain women from obtaining a pre-viability abortion, it is invalid under *Casey*. *Casey*, 505 U.S. at 846, 879 ("Before viability, the State's interests are not strong enough to support a prohibition of abortion. . . Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability."); *see also Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2320 (2016) (explaining that a law does not have to impose a substantial obstacle on a "large fraction" of women generally because "the relevant denominator is 'those [women] for whom [the provision] is an actual rather than an irrelevant restriction.'" (alterations in original) (quoting *Casey*, 505 U.S. at 895)).

A weighing of the other three factors tips the scales in favor of Plaintiffs as well. As to the likelihood that the moving party would be irreparably harmed, Plaintiffs' patients would be irreparably harmed as a matter of law by the loss of their constitutional right to seek an abortion before viability. *See Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) ("[W]hen reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) (finding irreparable injury where plaintiff showed substantial likelihood of success on merits of constitutional challenge to abortion regulation). Plaintiffs have likewise shown that the equities and public interest weigh in their favor. A preliminary injunction in this case would merely preserve the status quo and ensure Plaintiffs'

---

that a state "may properly assert important interests in . . . maintaining medical standards"). Further, this argument fails because "[w]hile the Supreme Court has acknowledged that a state has a legitimate interest in protecting the integrity and ethics of the medical profession, the Supreme Court has recognized that a state cannot use its regulatory power to impose an undue burden on a woman's right to choose." *Preterm-Cleveland v. Himes*, 294 F. Supp. 3d 746, 756 (S.D. Ohio 2018) (citing *Gonzales v. Carhart*, 550 U.S. 124, 157–58 (2007)).

patients have access to constitutionally protected health care services through the duration of the case. And "the public is certainly interested in the prevention of enforcement of [laws] which may be unconstitutional." *Planned Parenthood Ass'n of Cincinnati, Inc.*, 822 F.2d at 1400. Finally, as to the harm to others, Defendants argue that a preliminary injunction will harm the state because any time a state is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury. Because we have already concluded that there is a likelihood that the statute is unconstitutional, it is "questionable whether the [State] has any 'valid' interest in enforcing" it. *Id.* Even if the Defendants' argument was true, however, because all three other factors weigh in favor of Plaintiffs, the district court did not abuse its discretion in granting a preliminary injunction.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of the preliminary injunction.

---

**DISSENT**

---

ALICE M. BATCHELDER, Circuit Judge, dissenting. In *Box v. Planned Parenthood of Indiana and Kentucky, Inc.*, 139 S. Ct. 1780, 1782-93 (2019), Justice Thomas explained how Indiana's law "and other laws like it promote a State's compelling interest in preventing abortion from becoming a tool of modern-day eugenics," *id*. at 1783 (Thomas, J., concurring). The same goes for Ohio's law H.B. 214 before us today. Even more to the point here, perhaps, given the majority's analysis, is the further explanation that, "[w]hatever else might be said about *Casey*, it did not decide whether the Constitution requires States to allow eugenic abortions." *Id.* at 1792 (Thomas, J., concurring). I would apply that reasoning here to uphold Ohio H.B. 214.

In this challenge to H.B. 214, we hear the distant echo of the sorry case of *Buck v. Bell*, 274 U.S. 200, 207 (1927), in which the Supreme Court upheld a Virginia law—under which state officials sought to sterilize Carrie Buck, "the probable potential parent of socially inadequate offspring"—by finding that to allow such births would "sap the strength of the State" and "swamp" society "with incompetence." The effect was the federal judicial endorsement of eugenics. In fact, "[a]s an advertisement for eugenics, *Buck v. Bell* worked." Jeffrey S. Sutton, *51 Imperfect Solutions* 117 (2018). Within five years, a majority of states had enacted eugenics laws, *id*., and annual forced sterilizations increased tenfold to almost 2,300. Peter Quinn, *Race Cleansing In America*, 54 American Heritage, 2-3 (2003).

The eugenicist impulse on display in *Buck*, and amplified in its aftermath, is no mere relic of history. Today, many countries celebrate the use of abortion to cleanse their populations of babies whom some would view—ignorantly—as sapping the strength of society. France and Iceland, to name only two, have in recent years achieved a birth rate of nearly zero Down Syndrome infants.[1]

---

[1]The record contains a declaration by a physician and medical ethicist that France aborts 96% of unborn children who receive a diagnosis of Down Syndrome. Iceland, as public policy, appears to be nearing a 100% rate of abortion for unborn children diagnosed with Down Syndrome.

Ohio enacted the Antidiscrimination Law, H.B. 214, to counteract such eugenicist practices concerning the prenatal Down Syndrome population. The law prevents a physician from performing an abortion when the physician knows the abortion is sought not because the woman did not intend to become pregnant, but because the child in the woman's womb tested positive for Down Syndrome. Ohio concluded that permitting physicians to become witting accomplices to the deliberate targeting of Down Syndrome babies would undermine the principle that the Down Syndrome population is equal in value and dignity to the rest of Ohio's population, and would do deep damage to the integrity of the medical profession.

The majority holds Ohio's choice unconstitutional. But controlling precedent requires that we review laws like H.B. 214 under an undue-burden analysis, which is fact-intensive and must consider the State's interests and the benefits of the law, not just the potential burden it places on women seeking an abortion. Neither the district court nor the majority here makes a genuine attempt to meet that demand, which leaves their decisions insupportable and incorrect.

Consider *Gonzales v. Carhart*, 550 U.S. 124 (2007), in which the Supreme Court upheld a federal law banning—both before and after viability—a method of partial-birth abortion. The Court emphasized the post-viability status in describing the procedure in the second trimester:

> Dr. Haskell went in with forceps and grabbed the baby's legs and pulled them down into the birth canal. Then he delivered the baby's body and the arms— everything but the head. The doctor kept the head right inside the uterus . . . The baby's little fingers were clasping and unclasping, and his little feet were kicking. Then the doctor stuck the scissors in the back of the head, and the baby's arms jerked out, like a startle reaction, like a flinch, like a baby does when he thinks he is going to fall. The doctor opened up the scissors, stuck a high-powered suction tube into the opening, and sucked the baby's brains out. Now the baby went completely limp . . . He cut the umbilical cord and delivered the placenta. He threw the baby in a pan, along with the placenta and the instruments he had just used.

*Id*. at 138-39. The Court's decision to uphold the restriction rested on the doctrinal principles set forth in *Roe v. Wade*, 410 U.S. 113 (1973), as refined and amended by *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992). What makes *Gonzales* particularly applicable here is that there, as here, the Court dealt not with a *total ban* against abortion but with a regulation that prohibited physicians from performing abortions under certain conditions. The

*Gonzales* Court evaluated the partial-birth abortion law in light of two government interests: protecting fetal life from an inhumane procedure and protecting the integrity of the medical community. *Gonzales*, 550 U.S. at 156-58. Likewise, in addition to other asserted interests, Ohio justified H.B. 2014 on the express ground that it will protect the integrity of the medical profession.

Three principles drawn from *Gonzales* guide our analysis. One, pre-viability abortions are subject to restriction, as that is precisely what *Gonzales* upheld. *Id*. at 147 ("The Act does apply both previability and postviability."). Two, pre-viability abortion restrictions can be justified by a governmental interest in, among other things, "protecting the integrity and ethics of the medical profession." *Id*. at 157 (internal quotation marks omitted). And, three, the framework for evaluating such laws is the undue-burden test, which holds that, "[w]here it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests." *Id*. at 158. Applying this legal framework, our task was therefore to decide whether the district court erred by finding that Preterm-Cleveland could likely prove that H.B. 214 lacks a rational basis, fails to further the asserted interest, or imposes an undue burden on women seeking abortions. *See id.* at 157-61.

But the district court made no effort to apply anything resembling this legal standard, giving the nod to the undue-burden framework in a mere four sentences of conclusory rhetoric:

> H.B. 214 is clearly an 'undue burden.' The 'obstacle' it places in the path of women seeking a pre-viability abortion for one of the proscribed reasons is not merely 'substantial,' it is insurmountable. H.B. 214 does not 'burden' the right of such women to choose a pre-viability abortion, it eradicates the right entirely. Because H.B. 214 prevents certain women from choosing to terminate a pregnancy pre-viability, and because 'the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure,' H.B. 214 is unconstitutional.

*Preterm-Cleveland v. Himes*, 294 F. Supp. 3d 746, 754-55 (S.D. Ohio 2018) (citing *Casey*, 505 U.S. at 846). That is not the legal framework established in *Gonzales*.

The district court cited no evidence to support its bald assertion that H.B. 214 places an "insurmountable" obstacle in the path of women seeking an abortion and that alone would

warrant reversal. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (reversing a preliminary injunction against a Montana law because "there was insufficient evidence in the record that the requirement posed a 'substantial obstacle' to abortion"). And that sparse analysis also fails the mandate of *Whole Women's Health v. Hellerstedt*, 136 S.Ct. 2292 (2016), in which the Court held that the undue-burden analysis requires an examination of "the burdens a law imposes on abortion access *together with the benefits* those laws confer," *id*. at 2309 (emphasis added). The district court's opinion contains no recognition of any benefits, though they are not hard to find: Ohio's interest in the integrity of the medical profession qualifies as rational under *Gonzales*, and as an "Antidiscrimination Law," H.B. 214 serves Ohio's interest in upholding the equal dignity of the Down Syndrome population by ending discriminatory practices against that population.

The other two prongs of the *Gonzales* inquiry—whether the law furthers the government's interests and whether the law imposes an undue burden—are questions that the district court declined to address or to develop a record on which to base an answer. A plain reading of H.B. 214 does not alone reveal the nature or degree of any burden the law may place on women seeking abortions. For example, while H.B. 214 does require that "the attending physician shall indicate that [he or she] does not have knowledge" that the woman was seeking the abortion because of the unborn child's having Down Syndrome, H.B. 214 does not require that a physician inquire into the motivations of the woman seeking an abortion, nor does it require the woman to disclose her motivations, nor does it instruct a physician to speculate. Only when a physician *knows* that an unborn child with a positive Down Syndrome diagnosis is being targeted for abortion *on that basis* does liability attach if the physician then performs the abortion anyway. *See* O.R.C. § 2929.10(B).

It is possible that, even if a woman were to volunteer that she was seeking an abortion because her unborn child had tested positive for Down Syndrome, the physician could refer the woman to another physician. Under a proper analysis, such a consequence may not qualify as an undue burden. *See Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 605 (6th Cir. 2006) ("While closing the Dayton clinic may be burdensome for some of its potential patients, the fact that these women may have to travel farther to obtain an abortion does not constitute a

substantial obstacle."). And whether the abortion of unborn children diagnosed with Down Syndrome "requires specific regulation because it implicates additional ethical and moral concerns that justify a special prohibition," *Gonzales*, 550 U.S. at 158, is a question that must be explicitly addressed.

For these reasons and those presented by Justice Thomas in his concurrence in *Box*, I must respectfully dissent.